SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
JUSTICE DONOHUE
In this capital appeal, both Appellant Lavar D. Brown ("Brown") and the Commonwealth of Pennsylvania ("Commonwealth") challenge the order of the Court of Common Pleas of Philadelphia County *137 dismissing Brown's petition for relief filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541 - 9546 ("PCRA"). In this case, Brown and the Commonwealth have filed a "Joint Application for Leave to File Post-Submission Communication and Joint Motion to Vacate Death Sentence, Remand for Resentencing to Life Without Parole, and Then Transfer Appeal To Superior Court ("Joint Motion"), in which they request that this Court grant PCRA relief as to Claim VI in Brown's PCRA petition, which asserts that trial counsel provided ineffective assistance during the sentencing phase of the trial. Specifically, the parties request that this Court order that Brown's death sentence be vacated, that his case be remanded to the Court of Common Pleas of Philadelphia County for the limited purpose of resentencing Brown to life without parole, and that the case then be transferred to the Superior Court for merits disposition of Brown's guilt phase claims. For the reasons that follow, we deny the Joint Motion and affirm the PCRA court's denial of Brown's PCRA petition.
On direct appeal, this Court described the basic factual background underlying Brown's convictions for the shooting death of Robert Crawford ("Crawford"):
On December 10, 2003, [Brown], then age 24, and Rahsaan Anderson [ ("Anderson") ] were standing on Girard Avenue in Philadelphia, near a school, subway station, gas station, and restaurant. Around 3:00 p.m., [Brown] saw Robert Crawford [ ("Crawford") ] crossing Girard Avenue, and stated, "There go that pussy." N.T., 5/26/2005, at 33. [Brown] approached Crawford and, without provocation, shot him multiple times in the back.
After shooting Crawford, [Brown] and Anderson began to run but were quickly deterred by two police officers in a patrol vehicle. One officer stopped and frisked Anderson, but found no weapon. The second officer saw [Brown] across the street with his right hand in his jacket pocket and ordered him multiple times to show his hands. [Brown] refused to remove his hand from his pocket and instead ran back toward the crime scene and down an alley. The officer pursued him, commanding him to stop. [Brown] continued to run, and other officers joined the chase. [Brown] eventually crawled beneath a [Jeep Cherokee]; the officers pulled him out and took him into custody. A .380 caliber semi-automatic firearm was found near the vehicle's right rear axle.
Commonwealth v. Brown , 605 Pa. 103, 987 A.2d 699, 703 (2009).
The Commonwealth charged Brown with multiple crimes, including first-degree murder. Trial commenced on May 25, 2005 before the Honorable Teresa Sarmina, at which several eyewitnesses testified. Royal Smith ("Smith"), a youth advocate worker, identified Brown in court as the shooter, unequivocally stating that she "knew it was him because I was looking right at him. I couldn't believe it." N.T., 5/25/2005, at 63. She testified that she was sitting in her minivan, parked in a lot shared by a McDonald's restaurant and a gas station, waiting to pick up her client, Christine Ellison ("Ellison"), from the nearby William Penn High School. Id. at 48-49. At approximately 3:05 p.m., Ellison got into the front passenger seat of the minivan. As Smith prepared to pull out of the parking lot, she heard gun shots to her left. Id. at 52-53. She testified that she immediately turned in that direction and observed Brown shooting Crawford at close range. Id. at 54. After Crawford collapsed, Smith observed Brown shoot him again. Id. Brown was the only individual that Smith saw brandish a gun. Id. at 61-62.
*138 Smith testified that she was approximately four to five feet away from the incident, it was light outside, nothing prevented her from seeing Brown's face, and she was close enough to see Brown's silver handgun emitting blue light. Id. at 51, 55, 58. Smith marked her location and Brown's at the time of the shooting on a to-scale diagram of the crime scene (hereinafter, the "Diagram"). Id. at 82. After observing Brown shoot Crawford, she saw Brown run down Girard Avenue with a "light-skinned guy," later identified as Anderson, towards a Rite Aid. Id. at 62. To Smith's surprise, Brown then ran back toward the crime scene and by the passenger side of her minivan, at which time she got another good look at his face, as "he was running extremely slow." Id. at 70-73. After police apprehended Brown minutes later, they handcuffed him and brought him back to the crime scene, where Smith identified him for police as the shooter. Id. at 77-78.
Ellison testified that she had just been released from school, and upon getting into the front passenger seat of Smith's minivan, she observed a dark-skinned man wearing camouflage pants shoot Crawford with a silver handgun. According to Ellison, the shooter and Crawford were about three to four feet from Smith's minivan when this occurred. Id. at 151. She marked her approximate location at this time on the Diagram and testified that she clearly saw the shooter's face, as nothing impeded her view of his face. Id. at 154-55. Ellison then testified that Smith pulled over to the side of Girard Avenue, at which time she observed the shooter and a light-skinned man run towards a Rite Aid. Id. at 160. Like Smith, Ellison stated that she never saw the light-skinned man with a gun, nor did she see him shoot anyone. Id. Ellison indicated that when the shooter ran back towards the minivan, she observed his face again before he disappeared down an alley. Id. at 164-65, 167-68. When police returned to the scene minutes later with Brown in handcuffs, Ellison identified him for police as the shooter. Id. at 170-71.
When asked on direct examination whether she saw the shooter in the courtroom, Ellison replied that she did not know. Id. at 149-50. On redirect, however, she identified Brown as the shooter, explaining that she had not previously identified him in court because she had been unable to get a good look at him. Id. at 214. Additionally, she stated that she independently recognized Brown because on a prior occasion predating the shooting he had asked her for her phone number. Id.
Anderson testified that he "barely knew" Brown and had only encountered him "a couple of times around the neighborhood" prior to the shooting. N.T., 5/26/2005, at 24-25. Anderson did not know Crawford. Id. at 33. On the day in question, Anderson testified that he was standing on his porch when he saw Brown walking down the street. Id. at 26. He and Brown started talking and then walked to a store where Anderson purchased food and cigarettes. Id. As they exited the store and walked across the street towards a gas station, they saw Crawford exit the same store and walk towards the area where Brown and Anderson were standing. Id. at 29. According to Anderson, Brown then referred to Crawford as a "pussy" and "turned around and just started shooting" him approximately four to six times with a silver hand gun. Id. at 35-36. Anderson described the clothing Brown was wearing - camouflage pants and a black jacket. Id. at 36.
Anderson estimated that Crawford and Brown were approximately fifteen feet apart during the shooting, while Anderson was about six feet from Brown. Id. at 34-35. Anderson marked his, Brown's and *139 Crawford's approximate locations on the Diagram. Id. Anderson testified that when Brown began firing gun shots, he got scared and ran away toward the Rite Aid. Id. at 38-39. Two police officers briefly stopped and searched him, but upon finding no weapons, they released him and instead pursued Brown. Id. at 43-48. That evening, the police detained Anderson and took him to the police station, where he provided a witness statement implicating Brown and detailing the above sequence of events. Id. at 54.
Angela Sutton ("Sutton") testified that she and her friend, Janell Gonzalez ("Gonzalez"),[1] were crossing the street when they "saw a guy in a white skully and like a black jacket and some blue jeans shoot another guy in the back, and then he fell." N.T., 5/27/2005, at 16. Because Sutton was attempting to help Crawford, she indicated that she did not observe the police chase. Id. at 24. Sutton stated that she did not see the shooter's face, but she testified that the shooter was darker-skinned than she was and approximately five feet seven to five feet nine inches tall. Id. at 31. Sutton also confirmed that "after everything was over[,]" she saw a man wearing a red coat with the police but indicated that he was not the shooter because he was lighter-skinned and thinner than the shooter. Id. at 33-35.
Leo Rahill ("Rahill"), the Commonwealth's crime scene investigator, was shown the Diagram utilized during the examinations of other witnesses. N.T., 5/26/2005, at 302. On cross-examination, Rahill testified that based upon their marks on the Diagram, Anderson and Smith were approximately 160 to 240 feet apart. Id. at 328. Rahill marked on the Diagram where he found three fired cartridge casings and where a sample of Crawford's blood was collected. Id. at 305, 312. Rahill estimated that the distance from where Crawford was located to Smith's minivan was approximately 110 feet. Id. at 329-31.
Officer John Cannon ("Cannon"), the Commonwealth's firearms expert, testified that he received for testing the three fired cartridge cases found by Rahill from the crime scene. Id. at 115. When asked how far he would expect a fired cartridge casing to travel when ejected, Cannon explained that it could "literally drop at my feet" or "it could go as far as fourteen feet." Id. at 142. He indicated that he had never seen a casing fly as far as 100 feet. Id. at 143. He acknowledged that, "depending on how the [fired cartridge casing] lands, it could bounce a little bit where it was or it could hit and actually go a couple feet." Id. at 145. He also testified that at a busy crime scene where bystanders and police officers are running, a number of factors could cause the casing to move before its discovery and collection. Id. at 150.
On May 31, 2005, the jury convicted Brown of first-degree murder, 18 Pa.C.S § 2502(a), possessing an instrument of a crime, 18 Pa.C.S. § 907(a), and carrying a firearm without a license, 18 Pa.C.S § 6106. On June 2, 2005, following the penalty phase of the trial, the jury unanimously returned a verdict of death, finding no mitigating circumstances and two aggravating circumstances: (1) that Brown knowingly created a grave risk of death to additional individuals other than the victim in the commission of the offense, 42 Pa.C.S. § 9711(d)(7), and (2) that Brown had been convicted of another murder committed in any jurisdiction, 42 Pa.C.S. § 9711(d)(11).[2] 42 Pa.C.S. § 9711(f). Accordingly, *140 the trial court sentenced Brown to death. 42 Pa.C.S. § 9711(g). On December 29, 2009, this Court affirmed Brown's judgment of sentence, Commonwealth v. Brown , 605 Pa. 103, 987 A.2d 699 (2009), and on October 4, 2010, the United States Supreme Court denied his petition for writ of certiorari. Brown v. Pennsylvania , 562 U.S. 844, 131 S.Ct. 76, 178 L.Ed.2d 52 (2010).
On December 28, 2010, Brown filed his first pro se PCRA petition. The Federal Community Defender Office entered its appearance on his behalf, and on May 16, 2014 it filed an amended PCRA petition. The Commonwealth filed a motion to dismiss on January 30, 2015, and Brown filed a counseled response on June 24, 2015, raising fourteen issues.
On November 6, 2015, Judge Sarmina granted Brown an evidentiary hearing limited to one issue - whether trial counsel was constitutionally deficient for failing to interview and present Joseph Hayes ("Hayes") as a witness at trial. Hayes purportedly owned the Jeep Cherokee under which the police found Brown and the murder weapon. At the date and time of the scheduled evidentiary hearing (January 15, 2016), Hayes did not appear. Accordingly, on April 7, 2016, the PCRA court issued a lengthy (sixty-three-page) notice pursuant to Rule 907 of the Pennsylvania Rules of Criminal Procedure ("Rule 907 Notice") of its intent to dismiss Brown's PCRA petition, advising Brown that he could submit additional information in support of his claims within twenty days of the notice. On June 24, 2016, the PCRA court dismissed Brown's PCRA petition. In response to Brown's subsequent notice of appeal and his statement of issues complained of on appeal ( Pa.R.A.P. 1925(b) ), the PCRA court issued a written opinion rejecting Brown's arguments.
Brown now appeals the denial of PCRA relief to this Court.[3] In his principal brief, Brown raised the following thirteen issues for our consideration:
I. Was [Brown] denied effective assistance of counsel because trial counsel opened the door to harmful evidence; failed to investigate, discover and present evidence to attack identifications made by two eyewitnesses, which would have supported appropriate Kloiber instructions as to these witnesses; and did the trial court give an erroneous Kloiber instruction and counsel were ineffective?
II. Was [Brown] denied effective assistance of counsel because trial counsel failed to adequately investigate, uncover and utilize evidence to impeach and rebut Commonwealth witness Rahsaan Anderson and failed to obtain a cautionary jury instruction with regard to this witness' credibility; and did the Commonwealth violate Brady ?
III. Was [Brown] denied due process and effective assistance of counsel because the prosecutor misrepresented the testimony of Commonwealth witness *141 Angela Sutton, without objection from trial counsel?
IV. Was [Brown] denied effective assistance of counsel because trial counsel failed to investigate, discover and present evidence rebutting Commonwealth witnesses who connected [Brown] to the murder weapon and that the Commonwealth violated Brady by failing to disclose impeachment evidence?
V. Were trial counsel constitutionally ineffective for failing to retain and consult with an eyewitness identification expert at trial?
VI. Was [Brown]'s counsel ineffective at sentencing for failing to investigate, develop and present important mitigating evidence?
VII. Was [Brown] denied a reliable sentencing because the jury was tainted by outside influence and the Commonwealth improperly argued non-statutory aggravation and dismissed [Brown]'s mitigation as an excuse?
VIII. Was [Brown] denied due process, reliable sentencing and effective assistance of counsel because the Commonwealth introduced into evidence a constitutionally infirm prior homicide conviction at the penalty hearing?
IX. Was [Brown] denied due process, a reliable sentencing, the right to confrontation, and effective assistance of counsel by the Commonwealth's presentation of irrelevant, inflammatory and false hearsay testimony and argument about [Brown]'s prior homicide trial without adequate challenge from counsel?
X. Was [Brown] denied due process, a reliable sentencing and effective assistance of counsel because the jury was never instructed that he would be statutorily ineligible for parole if he were sentenced to life and prior counsel never raised this issue?
XI. Was [Brown] denied his right against self-incrimination, due process, a reliable sentencing and effective assistance of counsel by the trial court's improper decision to allow the Commonwealth to introduce evidence of [Brown]'s purported lack of remorse and appellate counsel's failure to adequately litigate this issue?
XII. Was [Brown] prejudiced by the cumulative effects of the errors in his case?
XIII. Did the lower court err in denying [Brown] full, fair and reliable PCRA review?
Brown's Brief at 2-3 (some issues reordered for ease of review). On September 19, 2017, the Commonwealth filed a lengthy (ninety-eight-page) brief in which it opposed any and all relief on these thirteen issues. On November 13, 2017, Brown filed a reply brief. In accordance with section 3(B) of this Court's Internal Operating Procedures with respect to PCRA appeals, the case was submitted on the briefs without oral argument.
On April 9, 2018, prior to this Court's issuance of an opinion deciding Brown's appeal from the PCRA court's ruling, Brown and the Commonwealth filed the Joint Motion. In the Joint Motion, the Commonwealth confesses error with respect to Claim VI in the above-listed issues raised by Brown in this appeal, requesting that this Court grant Brown relief as a result of ineffective assistance of trial counsel during the penalty phase of the trial. Joint Motion, ¶ 5. The Commonwealth did not provide any specificity with respect to its newfound agreement regarding the nature of trial counsel's alleged ineffectiveness, instead stating merely that it "agrees, and respectfully requests, that this Court grant [Brown] relief on Claim VI set forth in [Brown's] Brief...." Id. In the Joint Motion, the parties request that *142 this Court effectuate three types of relief: (1) grant relief on Claim VI and vacate Brown's death sentence; (2) remand the case to the Court of Common Pleas for Philadelphia County for the limited purpose of resentencing Brown to a sentence of life without parole; and (3) transfer the case to the Superior Court for a merits disposition of Brown's guilt phase claims.
By order dated April 23, 2018, this Court granted that part of the Joint Motion requesting leave to file a post-submission communication. With respect to the above-listed requests for relief, we observed that the Joint Motion offers no substantive development of the reasons why this Court can, or should, issue an order in the form sought by the parties. Accordingly, this Court directed the parties, either individually or collectively, to file a supplemental brief or briefs in support of the Joint Motion. In this regard, we specifically instructed the parties to delineate the legal authority that would support this Court's authorization, in a capital, post-conviction case, to accept an agreement requiring vacation of a PCRA court's decision to deny relief from a death sentence, absent any actual merits review of the underlying claim. We further ordered the parties to provide legal authority for their request to remand the case with instructions to the PCRA court to impose a life sentence on remand, and to discuss the express statutory commands of the PCRA. We also advised the Commonwealth that, to the extent that it considered it useful to inquire into the merits of Claim VI, it could file an application seeking leave to amend the merits brief that it previously submitted as of record advocating for the denial of any PCRA relief (including with respect to Claim VI). Finally, we directed our Prothonotary to provide notice of our order to the Attorney General of Pennsylvania and invited him to participate as an amicus and file a brief.
In response, Brown and the Commonwealth have each filed briefs in support of the Joint Motion. In his supplemental brief, Brown argues that the district attorney is "the sole public official charged with the legal responsibility of conducting in court all criminal and other prosecutions, in the name of the Commonwealth," and that his prosecutorial discretion extends to all stages of criminal litigation. Brown's Supplemental Brief at 2, 11. Contrasting the district attorney's role with that of this Court, Brown contends that this Court's "neutral role precludes it from acting as an advocate or interfering with the District Attorney's lawful exercise of discretion." Id. at 11. According to Brown, in light of these "distinct structural roles," this Court "must defer to the District Attorney's exercise of discretion in conceding sentencing error." Id. at 12. Failing to do so, Brown insists, would violate his "constitutional rights and would take this Court far afield from its proper and traditional role." Id. at 12. Alternatively, Brown claims that even if this Court were to decline to accept the "stipulation" of the parties without judicial review, we should nevertheless, in the interests of justice and judicial economy, grant the Joint Motion, as the certified record reflects that Claim VI is meritorious because the PCRA court clearly erred in concluding that trial counsel did not provide ineffective assistance during the penalty phase of the trial. Id. at 7, 13-17.
The Commonwealth's arguments largely mirror those of Brown. While this Court has broad powers, the Commonwealth insists that only district attorneys, as a result of their "wide grant of prosecutorial discretion,"[4] have the "power to decide *143 whether to seek or continue to seek the death penalty in view of the facts of any particular case." Commonwealth's Supplemental Brief at 2. According to the Commonwealth, when a district attorney makes a "reasoned fact and policy-based decision not to defend a particular conviction or sentence," this Court must immediately remand for imposition of the agreed-upon relief, as this Court may not "second-guess legitimate exercises of prosecutorial discretion." Id. at 3. Though acknowledging that the United States Supreme Court has indicated that some cases require judicial review on the merits of confessions of error by prosecutors, the Commonwealth claims that these cases were unique instances in which an interpretation of constitutional law or criminal statutes - a "quintessentially judicial function" - was required. Id. at 7 n.6. In the present case, where the confession of error involves factual and policy-based decisions - a "quintessentially prosecutorial function" -- no judicial review is necessary. Id.
Alternatively, if the Court will not accept the agreement of the parties set forth in the Joint Motion without conducting merits analysis, the Commonwealth recommends that we remand the case to the PCRA court for further consideration in light of said agreement. Id. at 9. The PCRA court, in denying relief, did not have before it the Commonwealth's confession of error and thus should be permitted to reconsider its decision to deny relief in this light. Id. at 11-12. Finally, if this Court rejects its first two alternative courses of action, the Commonwealth presents argument based upon the certified record in support of its confession of error, now contending that trial counsel in fact provided ineffective assistance of counsel in the penalty phase of Brown's trial. Id. at 12-19. Although these arguments are in direct contradiction to those set forth in the Commonwealth's merits brief, the Commonwealth has not filed an application seeking leave to amend its merits brief to conform its arguments (especially with respect to Claim VI) to those now set forth in its supplemental brief. The Commonwealth was given express permission to file such an amended brief in our order dated April 23, 2018.
In accordance with our invitation to do so, the Attorney General filed an amicus brief. Therein, the Attorney General stresses that he is a "steadfast advocate for broad prosecutorial discretion." Attorney General's Brief at 2. Nevertheless, the Attorney General disagrees with the parties that this Court must, or even may, accept confessions of error by a prosecutor without conducting judicial merits review. Citing to cases from both this Court and the United States Supreme Court, the Attorney General argues that if courts were required to accept confessions of error without merits review, they would not be acting as judges but rather as mere rubber stamps. Id. at 3. Instead, the Attorney General asserts that a prosecutor's confession of error is "properly viewed not as dispositive, but as persuasive, often highly persuasive." Id. While the Attorney General *144 takes no position with respect to the merits of Brown's ineffectiveness claim, he disagrees with the Commonwealth's recommendation to remand the case to the PCRA court for further consideration in light of the confession of error. Id. at 21-27. The Commonwealth's current position with respect to the merit of Brown's ineffectiveness claim in Claim VI is now aligned with that of Brown - which position was thoroughly litigated to conclusion in the PCRA court. Id.
During the penalty phase of Brown's trial, a jury of Philadelphia citizens was called upon to make the enormously difficult decision of whether to impose the death sentence, after hearing the evidence and instructions on the law. A representative cross section of the community must, of necessity, bear the responsibility to "express the conscience of the community on the ultimate question of life or death" in particular cases. Witherspoon v. Illinois , 391 U.S. 510, 519, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The jury in this case having done so, neither the parties, by agreement, nor this Court, absent a finding of legal error, have the power or ability to order that the jury's verdict be commuted to a life sentence without parole.[5]
Neither Brown nor the Commonwealth have cited to any persuasive authority to support a contrary conclusion. In this regard, we note that Brown seeks relief under the PCRA, pursuant to which the General Assembly has expressly limited this Court's power to award relief.[6] Commonwealth v. Pitts , 603 Pa. 1, 981 A.2d 875, 878 (2009) ("In PCRA proceedings, an appellate court's scope of review is limited by the PCRA's parameters...."). Of relevance here, section 9543(a) provides that "[t]o be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence," inter alia, that the petitioner is "awaiting execution of a sentence of death for the crime," and that the conviction or sentence resulted from "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(1)(ii), (a)(2)(ii). Moreover, section 9546(a) provides that the court "shall order appropriate relief" only if it "rules in favor of the petitioner." 42 Pa.C.S. § 9546(a). Accordingly, to be eligible for relief under the PCRA, Brown must plead and prove that his counsel provided ineffective assistance during the penalty phase of his trial, *145 and this Court must rule in his favor. As a result, the PCRA expressly requires Brown to prove the allegations of ineffectiveness of counsel and for the courts to rule in his favor - finding legal error to permit a grant of relief. In short, the PCRA requires judicial merits review favorable to the petitioner before any relief may be granted. A confession of error by the Commonwealth does not constitute a judicial ruling in Brown's favor, and thus is insufficient for any grant of relief under the PCRA.
The arguments of both Brown and the Commonwealth do not focus on the statutory language of the PCRA. Instead, they contend that regardless of procedural posture, in any case that has its genesis in the exercise of the district attorney's prosecutorial discretion, the prosecutor's confession of error obviates the need for judicial review. In support of this position, Brown and the Commonwealth focus on the relative roles of this Court, through the exercise of its judicial powers, and district attorneys, through their exercise of prosecutorial discretion. Brown states that this Court wields "[a]ll powers necessary and appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law." Brown's Supplemental Brief at 4 (citing 42 Pa.C.S. § 502(1) ). The Commonwealth further reminds us that the Court possesses "every judicial power that the people of the Commonwealth can bestow under the Constitution of the United States, whether enumerated in the Constitution or residual." Commonwealth's Supplemental Brief at 3 (citing In re Bruno , 627 Pa. 505, 101 A.3d 635, 666 (2014) ). According to the Commonwealth, this grant of power permits this Court to accept the agreement embodied in the Joint Motion without judicial review. Id. at 4 (citing Commonwealth v. Stipetich , 539 Pa. 428, 652 A.2d 1294, 1295 (1995) ). Brown similarly argues that Pennsylvania law delegates solely to district attorneys the decision of whether to seek and defend death penalties, and that this discretion continues throughout "all stages of litigation." Id. 10-11. Because this Court must instead maintain a "neutral role," Brown argues that it may not interfere with a district attorney's "lawful exercise of discretion" - and thus, as a result of these "unique structural roles," this Court "must defer to the District Attorney's exercise of discretion in conceding sentencing error." Id. at 12.
Brown and the Commonwealth misconstrue the nature of a district attorney's prosecutorial discretion. As cogently explained by the Attorney General, the scope of prosecutorial discretion changes as a criminal case proceeds, narrowing as the case nears completion. At the outset, a prosecutor has almost unfettered power to charge, or not charge, as he or she sees fit.[7] Once charges are filed, the prosecutor may withdraw them by nolle prosequi, subject to judicial oversight. Pa.R.Crim.P. 585. A prosecutor may also choose to enter into a plea agreement, again subject to appropriate judicial oversight. Pa.R.Crim.P. 590.[8] The decision whether the Commonwealth will seek the death penalty is also left to the prosecutor, though this decision, which is made at the time of arraignment, is also potentially subject to some pre-trial judicial review. See *146 Commonwealth v. Buck , 551 Pa. 184, 709 A.2d 892, 896 (1998) ("If no evidence is presented in support of any aggravating circumstance, the trial court may rule that the case shall proceed non-capital.").
After trial and the entry of a capital verdict, however, a district attorney's prosecutorial discretion narrows significantly. There is an automatic appeal to this Court from a death sentence, 42 Pa.C.S. § 9711(h), over which the prosecutor has no statutory power to interfere. A representative cross section of the community has issued its decision, and the prosecutor, having sought and obtained the death sentence, may not thereafter unilaterally alter that decision. The community now has an interest in the verdict, which may thereafter be disrupted only if a court finds legal error. Contrary to the Commonwealth's representation that a district attorney remains free at "all stages of capital criminal litigation" to make a "reasoned fact and policy-based decision" as to what he or she believes the appropriate sentence should be, after seeking and obtaining a death sentence, the prosecutor's discretion at this point is limited to attempts, through the exercise of effective advocacy, to persuade the courts to agree that error occurred as a matter of law. Prosecutorial discretion provides no power to instruct a court to undo the verdict without all necessary and appropriate judicial review.
Cases from both this Court and the United States Supreme Court confirm this conclusion, namely that a district attorney's concession of error is not a substitute for independent judicial review. In Commonwealth v. Chimenti , 510 Pa. 149, 507 A.2d 79 (1986), after the Philadelphia District Attorney's Office obtained a conviction of first-degree murder, it was approached by Chimenti's new appellate counsel and advised that trial counsel had improperly acted contrary to Chimenti's best interests, including by the subornation of perjury against him. Id. at 80. The district attorney struck a deal with Chimenti, pursuant to which he would agree to vacate the first-degree murder conviction and replace it with a conviction for murder generally (not to rise higher than third-degree), in exchange for Chimenti's cooperation in an investigation and prosecution of his trial counsel. Id. The terms of this deal, which were set forth in a petition presented to the president judge of the Superior Court, requested an order that the case be remanded to the trial court for assignment to a hearing judge, who would vacate Chimenti's conviction and accept his negotiated plea. Id.
This Court rejected enforcement of the petition jointly filed by the district attorney and Chimenti. According to this Court, the deal "reduced the prospective hearing judge to a 'rubber stamp,' as he or she was empowered only to perform a ministerial function" - something that neither the president judge nor the Superior Court had any power to do. Id. at 83. Moreover, and more importantly, enforcement of the agreement would reverse a jury's verdict without any judicial review . We stated, in the strongest terms, that such an action would "abrogate a jury's verdict without any semblance of a record," an action that "we can in no way condone." Id. ; see also id. at 84 (Papadakos, J., concurring) (observing that the vacation of a jury's verdict of first-degree murder "without any trial errors shown," was "reminiscent of the Star-Chamber"). In response to the district attorney's contention that there were "potential problems with the verdict," this Court responded that "before we could accept that contention, a review of the merits on the record would be necessary." Id. at 83 n.9.
More recently, in Commonwealth v. Wright , 609 Pa. 22, 14 A.3d 798 (2011), five *147 years after the defendant's confession resulted in a conviction of first-degree murder, he filed a PCRA petition requesting DNA testing. The Superior Court applied a per se rule, holding that, in all instances, a voluntary confession precluded any reasonable possibility that DNA testing would produce exculpatory evidence. Id. at 807-08. On appeal to this Court, the Commonwealth conceded that that the Superior Court's application of a per se rule was error. Id. This Court, however, refused to accept this concession of error without undertaking our own review, stating that "even though the parties agree on this essential point, we are obliged to conduct our own independent judicial review...."[9] Id. at 808.
The Supreme Court has likewise refused to act on concessions of error without conducting appropriate judicial review.[10] In *148 Young v. U.S. , 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942), for instance, a physician was convicted for violating a federal anti-narcotics statute. The government conceded that the lower court had misinterpreted a portion of the statute providing an exception from prosecution. Id. at 258, 62 S.Ct. 510. While the Court ultimately agreed with the government's (and the defendant's) interpretation of the relevant statutory language, it refused to do so without judicial review, indicating that while the government's confession "is entitled to great weight," the obligation to properly apply the law rested with the Court rather than on the agreement of the parties.
The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. But such a confession does not relieve this Court of the performance of the judicial function. The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed. The public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding. That interest is entrusted to our consideration and protection as well as that of the enforcing officers. Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties.
Id. at 258-59, 62 S.Ct. 510 (citation omitted).
Similarly, in Sibron v. New York , 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the government confessed error with respect to the constitutionality of a defendant's conviction for unlawful possession of heroin. Reaffirming its decision in Young , the Court emphasized that "[i]t is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained." Id. at 58, 88 S.Ct. 1889. The Court further observed that "[t]he District Attorney for Kings County seems to have come late to the opinion that this conviction violated Sibron's constitutional rights." Id. at 58-59, 88 S.Ct. 1889. Because the highest appellate court in the state of New York had affirmed the conviction, the Court stated that "[f]or us to accept [the District Attorney's] view blindly in [these] circumstances" would be a "disservice to the State of New York and an abdication of our obligation to lower courts to decide cases on proper constitutional grounds...." Id. at 59, 88 S.Ct. 1889 ; see also Thompson v. United States , 444 U.S. 248, 250, 100 S.Ct. 512, 62 L.Ed.2d 457 (1980) (deciding, based upon "an independent examination of the record," to grant a remand for further proceedings, but refusing to grant the specific relief requested by the government); Mayberry v. Pennsylvania , 382 U.S. 286, 286, 86 S.Ct. 438, 15 L.Ed.2d 336 (1965) (granting relief in accordance with a concession of error based upon "an examination of the papers in the case").
*149 Brown and the Commonwealth argue that these cases have no application here because they involved issues of statutory interpretation and/or constitutional law (areas involving "quintessentially judicial functions"), whereas the present case involves a "factual and policy-based decision" not to continue pursuit of a death sentence (a "quintessentially prosecutorial function").[11] See Commonwealth's Brief at 7 n.6. We disagree. These cases address the respective roles and powers of prosecutors and courts with respect to jury verdicts. After the jury in this case reached its decision to enter a verdict recommending a death sentence, the district attorney lost any prosecutorial discretion to alter that verdict. If the law were otherwise, district attorneys would have the powers of courts, while courts would be reduced to mere rubber stamps (as we recognized in Chimenti ). As the Attorney General indicates, if the "power" of a court amounts to nothing more than the power "to do exactly what the parties tell it to do, simply because they said so and without any actual merits review, it is not judicial power at all. It is a restriction on power." Attorney General's Brief at 8 (emphasis in original).
Finally, we note that the Philadelphia District Attorney's Office, through the exercise of its prosecutorial discretion, actively sought and obtained a death sentence for Brown. It cannot now seek to implement a different result based upon the differing views of the current office holder with respect to the prior exercise of prosecutorial discretion. Elections alone cannot occasion efforts to reverse the result of judicial proceedings obtained by the prior office holder. Every conviction and sentence would remain constantly in flux, subject to reconsideration based upon the changing tides of the election cycles.
We also reject the alternate requests of Brown and the Commonwealth to remand this case back to the PCRA court for reconsideration in light of the Commonwealth's concession of error. While it is true that no such concession was before the PCRA court when it decided to dismiss Brown's PCRA petition, this does not constitute grounds for a remand. While, in its supplemental brief, the Commonwealth sets forth arguments in support of its current position that Brown's Claim VI is meritorious, those arguments are not substantially different from the arguments that Brown's counsel presented to the PCRA court when it was conducting merits review.
Accordingly, to complete our consideration of the Joint Motion, we proceed to merits review with respect to Claim VI.
*150 We review the denial of PCRA relief to decide whether the PCRA court's factual determinations are supported by the record and are free of legal error. Commonwealth v. Spotz , 610 Pa. 17, 18 A.3d 244, 259 (2011). When supported by the record, the PCRA court's credibility determinations are binding on this Court, but we apply a de novo standard of review to the PCRA court's legal conclusions. Id. We must review the PCRA court's findings and the evidence of record in a light most favorable to the Commonwealth as the winner at the trial level. Commonwealth v. Hanible , 612 Pa. 183, 30 A.3d 426, 438 (2011). Under Pennsylvania Rule of Criminal Procedure 909, which governs PCRA petitions in capital cases, the PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings." Pa.R.Crim.P. 909(B)(2). "[T]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." Commonwealth v. D'Amato , 579 Pa. 490, 856 A.2d 806, 820 (2004).
In order to obtain collateral relief under the PCRA, a petitioner must establish by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include, inter alia, a violation of the Pennsylvania or United States Constitutions or ineffectiveness of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i)-(ii). A petitioner must also show that the claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[ ]conviction proceeding." 42 Pa.C.S. § 9544(b).
With respect to claims of ineffective assistance of counsel, counsel is presumed to be effective, and the petitioner bears the burden of proving to the contrary. Hanible , 30 A.3d at 439. To prevail, the petitioner must plead and prove, by a preponderance of the evidence, the following three elements: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice as a result of counsel's action or inaction. Id. With regard to the second prong (reasonable basis), "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." Hanible , 30 A.3d at 439. We will hold that counsel's strategy lacked a reasonable basis only if the petitioner proves that a foregone alternative "offered a potential for success substantially greater than the course actually pursued." Spotz , 18 A.3d at 260. Our review of counsel's performance "must be highly deferential." Commonwealth v. Tharp , 627 Pa. 673, 101 A.3d 736, 772 (2014) (quoting Strickland v. Washington , 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ). To establish the third element (prejudice), the petitioner must *151 show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. Id.
Because a petitioner's failure to satisfy any of the above-mentioned elements is dispositive of the entire claim, "[a] court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the ineffectiveness test, the court may proceed to that element first." Id. at 747. Counsel will not be found ineffective for failing to raise a meritless claim. Commonwealth v. Washington , 592 Pa. 698, 927 A.2d 586, 603 (2007).
In Claim VI, Brown contends that trial counsel was ineffective for failing to investigate and present certain mitigation evidence at the penalty phase of his trial. In particular, Brown contends that trial counsel should have presented (1) expert testimony regarding his psychiatric condition and potential brain injury, (2) lay testimony about additional childhood difficulties, and (3) evidence regarding his lack of prison infractions prior to trial.
In Tharp , this Court fairly summarized the relevant law in this area as follows:
It is well-established that capital counsel has an obligation under the Sixth Amendment to conduct a reasonably thorough investigation for mitigating evidence or to make reasonable decisions that make further investigation unnecessary. Commonwealth v. Lesko, 609 Pa. 128, 15 A.3d 345, 380 (2011) ; Commonwealth v. Sattazahn, 597 Pa. 648, 952 A.2d 640, 655 (2008) ; Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's duty encompasses pursuit of all statutory mitigators of which he is aware or reasonably should be aware, unless there is some reasonable ground not to pursue the circumstance (such as when it might open the door to harmful evidence). Commonwealth v. Malloy, 579 Pa. 425, 856 A.2d 767, 787 (2004). In evaluating an ineffectiveness claim alleging counsel's failure to investigate and present mitigation evidence in a capital case, we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented. Lesko, 15 A.3d at 380 ; Commonwealth v. Collins, 585 Pa. 45, 888 A.2d 564, 580 (2005). None of the aforementioned factors is, by itself, dispositive, because even if counsel's investigation is deemed unreasonable, the defendant is not entitled to relief unless the defendant demonstrates that prejudice resulted from counsel's conduct. Id.
Tharp , 101 A.3d at 764 (internal quotation marks omitted).
a. Additional neuropsychological testing regarding brain injury testimony
We consider first Brown's argument that trial counsel was ineffective for failing to obtain neuropsychological testing that would have revealed brain damage. According to Brown, evidence of brain damage would have supported at least three mitigating circumstances, including sections 9711(e)(2) ("[t]he defendant was under the influence of extreme mental and emotional disturbance"); 9711(e)(3) ("[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"); and 9711(e)(8) ("[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").
*152 We begin by reviewing the reasonableness of trial counsel's investigation in this regard. Trial counsel retained Dr. Allen Tepper as an expert in psychology and forensic psychology. At trial, Dr. Tepper testified that in the past year, he had been retained to evaluate approximately "[thirty] criminal cases." N.T., 6/1/2005, at 210. Dr. Tepper stated that he did not "work for one side or the other," meaning that he has served as an expert for the prosecution, the defense, and as a court-appointed expert. Id.
Dr. Tepper requested a number of records, which trial counsel provided, including police reports, school records, past psychological and psychiatric evaluations, and reports relating to "different living situations in which [Brown] was involved." Id. at 213-14. On April 8, 2005, Dr. Tepper met with Brown privately for three and a half hours, at which time Dr. Tepper interviewed Brown and performed a psychological evaluation. Id. at 213. During this psychological evaluation, Dr. Tepper administered a series of psychological tests to assess his intellectual and emotional functioning. PCRA Petition, Appendix, Tepper Affidavit, ¶ 5. On May 23, 2005, for four and a half hours, Dr. Tepper interviewed numerous family members and friends. Upon reviewing all records and after meeting with the aforementioned individuals, Dr. Tepper concluded that he did not need to meet with Brown a second time. N.T., 6/1/2005, at 273.
At trial, Dr. Tepper testified that Brown's foot deformity contributed to early childhood difficulties and interfered with basic milestones, such as walking and crawling. Brown experienced instances of abandonment throughout his life. His stepfather abused him physically until he was approximately sixteen years old. Id. at 226-28. Brown fell within the average range of intelligence. Id. at 214-15. He suffered from learning and behavioral difficulties, which was evident in his school records. Id. at 216. Brown failed second, third and fourth grades, and through eleventh grade, he scored "extremely low" on standardized tests. Id. at 216, 218. Dr. Tepper acknowledged that Brown eventually obtained his GED, but Dr. Tepper also stated that it is possible for an individual with learning difficulties to obtain their GED. Id. at 219.
Dr. Tepper testified that prior to trial he had reviewed records of psychological testing conducted by Dr. Kenneth Moberg in September 1995, when Brown was sixteen years old.[12] Id. at 230. Dr. Tepper acknowledged that Dr. Moberg's report revealed "some slight indications of organic brain damage that can cause impulse control problems." Id. at 230. He further stated that Dr. Moberg had suggested that there was some "soft indications on one of the tests of possible organicity." Id. at 235. Despite the results reported by Dr. Moberg on this one test (the "Bender-Gestalt" test ), Dr. Tepper testified that "[t]here's no findings of any significant brain damage." Id. Dr. Tepper further indicated he had no evidence that Brown suffered from such a mental disturbance at the time of the killing. Id. at 279. Although Dr. Tepper believed Brown suffered from ongoing impulse control difficulties, he opined that Brown understood the difference between *153 right and wrong and was capable of conforming his conduct to law. Id. at 230.
In connection with the filing of the present counseled PCRA petition, Brown offered an affidavit from Dr. Tepper in which he conveyed that he reviewed Dr. Moberg's report and noted that it revealed brain organicity in Brown - which he apparently considered to be significant, as he indicated that he highlighted it in red. PCRA Petition, Appendix, Tepper Affidavit, 5/12/2014, ¶ 11. He further stated that, at that time, he called trial counsel to discuss, inter alia, Dr. Moberg's report, although he could no longer recall the substance of those conversations. Id. , ¶¶ 12-13. Two members of Brown's trial counsel team also submitted affidavits, both of which state that while there was some overlap, Attorney Daniel Rendine had primary responsibility for the guilt phase of the trial and Attorney Judith Rubino was primarily responsible for the penalty phase of the trial. PCRA Petition, Appendix, Rendine Affidavit, ¶ 3; PCRA Petition, Appendix, Rubino Affidavit, § 9. Attorney Rendine's affidavit contains no testimony regarding the substance of the conversation with Dr. Tepper. Attorney Rubino's affidavit states that if Dr. Tepper had recommended any neuropsychological testing, she would have requested court funding to provide it.[13] PCRA Petition, Appendix, Rubino Affidavit, 5/8/2014, ¶ 9.
Dr. Tepper's affidavit further states that if he had been aware of Brown's organic brain impairment at the time of trial, he would have testified that, at the time of the shooting, Brown was under the influence of an extreme mental disturbance, 42 Pa.C.S. § 9711(e)(2), and that additional evidence existed to support an independent mitigating circumstance, 42 Pa.C.S. § 9711(e)(8). In connection with this testimony from Dr. Tepper, Brown also submitted reports from Dr. Carol Armstrong, who conducted testing and made findings of neurocognitive impairment; psychiatrist Julie Kessel, who opined that Brown's "use of language, paranoid content, bizarre associations, profound circumstantiality, and odd body language suggest pervasive organic impacts and a mixed personality disorder," and Ribem Gur, Ph.D., who opined that the results of imaging of Brown's brain showed "abnormalities indicating brain damage" that are "consistent with *154 several causes, including traumatic brain injury." PCRA Petition, Appendix, Tabs 43-45. As such, Dr. Tepper indicated that if he had been provided with access to neuropsychological testing of the type performed by Drs. Armstrong and Gur, his testimony at trial regarding Brown's possible brain damage would have been very different. PCRA Petition, Appendix, Tepper Affidavit, 5/12/2014, ¶ 15.
Based on these submissions, Brown's PCRA petition included a claim (Claim VI) contending that trial counsel was ineffective for failing to request neuropsychological testing to detect possible brain damage. Brown's Brief at 74. According to Brown, Dr. Moberg's report, which "reported possible brain organicity," should have "flagged for counsel the need for further testing." Id. at 75. Brown indicates that Dr. Tepper's affidavit reflects that he changed his opinion regarding possible brain injury based upon the reports from Dr. Armstrong and Dr. Gur. Id.
The PCRA court rejected this claim without an evidentiary hearing. Reviewing, inter alia, Dr. Tepper's affidavit and the record of Dr. Tepper's trial testimony, the PCRA court found as follows:
Trial counsel was not ineffective for fail[ing] to present additional mitigation evidence in the form of neurological testing, when the psychological expert he had retained, Dr. Tepper, did not recommend such testing. Prior to testifying at the sentencing phase, Dr. Tepper had made note of [Brown's] 1995 psychological testing which stated that [Brown] had brain organicity, yet he did not change his opinion at trial - or even remark on the possible significance of that earlier testing - he merely mentioned it prior to giving his conclusion. N.T., 6/1/2005, at 228-30. Nor did he recommend to trial counsel that a neuropsychologist be hired. He also did not ask counsel to seek a continuance so that he could look into this further. Now, having reviewed the study once again, along with the opinions of other experts hired by PCRA counsel, Dr. Tepper states that he would have ordered neuropsychological testing, and that he would have testified that "at the time of the incident in question ... [Brown] could have been described as being under the influence of an extreme mental disturbance." Dr. Tepper's Affidavit, 5/12/2014, Petitioner's Appendix, at 26. This is not a ground for trial counsel ineffectiveness, as trial counsel was not an expert, and not required to recognize red flags from [Brown's] records. As Dr. Tepper had this information available to him prior to his trial testimony, this claim fails.
Rule 907 Notice, 4/7/2016, at 52 (emphasis in original).
We find this reasoning and analysis to be both sound and supported by the certified record on appeal. In two cases dealing with claims that counsel was ineffective for failing to spot "red flags" of brain damage and order neuropsychological testing, this Court has ruled that courts may not conflate the roles and professional obligations of experts and lawyers by demanding that counsel spot "red flags" when the mental health expert they hired failed to do so. In Commonwealth v. Lesko , 609 Pa. 128, 15 A.3d 345 (2011), the PCRA court granted Lesko PCRA relief based in part upon its finding that trial counsel did not consult a neuropsychologist, but instead retained a clinical psychologist, Herbert Levit, Ph.D. Dr. Levit reviewed available social history, interviewed Lesko and his family members and administered various psychological tests. He testified at trial that Lesko had borderline personality disorder and that at the time of the murders he was suffering from voluntary polysubstance abuse.
*155 On PCRA review, Lesko retained the services of a neuropsychologist, Dr. Barry Crown, who averred that there was sufficient evidence in the record to establish an indicia of brain damage, and that Dr. Levit's own psychological testing and diagnosis of borderline personality disorder were themselves "red flags" to a professional trained to spot organic brain damage. Id. at 377. Further, Dr. Crown indicated that he had performed neuropsychological testing, which in fact revealed that Lesko was brain damaged. Id. at 378. Based upon Dr. Crown's testimony, the PCRA court ruled that the retention of a neuropsychologist would have provided the jury with useful information when weighing mitigating factors, and trial counsel had provided no reasonable basis for not retaining a neuropsychologist to conduct further testing. Id.
This Court reversed, concluding that the PCRA court erred in placing "the burden of an expert's knowledge on counsel's shoulders...." Id. at 379. We cautioned that "in applying Strickland , courts must be careful not to conflate the roles and professional obligations of experts and lawyers." Id. at 382. We recognized that Dr. Crown found fault with the performance of Dr. Levit, not that of trial counsel. Id. at 377.
Dr. Crown opined that the results of some of the testing conducted by Dr. Levit raised "red flags," which indicated that neuropsychological testing should be conducted. Certainly, these psychological "red flags" could not be directed at counsel, who was unschooled in mental health matters, but were directed at Dr. Levit. In fact, by the neuropsychologist's own testimony, the diagnosis of Borderline Personality Disorder - a diagnosis made by Dr. Levit, not trial counsel - should have raised a question relating to the possibility of brain damage.
Id. In sum, we ruled that a failure to spot "red flags" of possible brain damage that may call into question the performance of the retained mental health professional "is not the same thing as providing a basis to fault trial counsel's legal performance." Id.
We reaffirmed our decision in Lesko in Commonwealth v. Robinson , 623 Pa. 345, 82 A.3d 998 (2013). In Robinson , on PCRA review, the appellant raised two arguments: first, that counsel failed to provide his retained mental health expert with school records that showed decreasing performances on IQ tests, a "red flag" for possible brain damage necessitating neuropsychological testing; and second, that counsel should have independently reviewed the school records and recognized the need for neuropsychological testing. With respect to the first issue, the PCRA court, based upon credibility determinations, concluded that counsel had in fact provided the school records to the mental health expert. With respect to the second, the PCRA court found no merit to this claim. On appeal, this Court affirmed on both issues, finding that the PCRA court's credibility determinations were supported by the factual record and that, based upon Lesko , it was the mental health expert's obligation, not counsel's obligation, to spot the "red flags" and recommend neuropsychological testing:
In light of the PCRA court's supported credibility determination that the records were provided to Dr. Sadoff, and Dr. Sadoff's unquestioned expertise, the Court would be hard pressed to fault trial counsel for failing to perceive a mental health "red flag" when the same information did not raise a red flag with the expert hired specifically for that purpose. This Court has made clear that in applying Strickland , courts must be careful not to conflate the roles and *156 professional obligations of lawyers and experts, and cannot demand that counsel, who otherwise act reasonably (as, for example, by hiring a mental health expert), recognize psychological "red flags." See Lesko , 15 A.3d at 382. Appellant makes a bald assertion that counsel should have pointed out the decrease in the childhood IQ scores to his expert, but never explains why this should have raised a "red flag" to a lawyer, who is unschooled in mental health matters.
Id. at 1015 ; see also Commonwealth v. Fears , 624 Pa. 446, 86 A.3d 795, 807-08 (2014) ("It was reasonable for trial counsel to rely on Dr. Martone's conclusions appellant was coherent and had no mental disorders besides pedophilia. Thus, appellant fails to show trial counsel lacked a reasonable basis not to further explore his capacity to plead guilty and waive his penalty phase jury.") (citation omitted).
Based upon Lesko and its progeny, the PCRA court in this case correctly ruled that trial counsel did not err in failing to conduct an independent examination of Dr. Moberg's report and hire a neuropsychologist to conduct further testing. See Rule 907 Notice, 4/7/2016, at 52. As the PCRA court recognized, Dr. Tepper did not recommend to trial counsel that a neuropsychologist be hired, and he did not ask counsel to seek a continuance so that neuropsychological testing could be performed, more records could be reviewed, or further interviews could be performed to explore the possibility that Brown had brain damage. Id. Furthermore, Dr. Tepper's trial testimony makes it abundantly clear that Dr. Tepper did not consider Dr. Moberg's report to contain any "red flags" of brain damage, as he plainly and without qualification testified on direct examination that said report contained only "slight indications" of possible brain injury, and on cross-examination confirmed his opinion that there is "no finding of any significant brain injury." N.T., 6/1/2005, at 230, 235. Based upon this factual record, and in light of this Court's legal analysis in Lesko and Robinson , Dr. Tepper's affidavit is insufficient to establish any grounds for PCRA relief, as Dr. Tepper's contention that he would have testified differently if he had access to neuropsychological testing raises issues with his own performance, not with the performance of trial counsel. It was his role as the mental health expert, rather than the role of trial counsel, to recognize the "red flags" and recommend further testing. Lesko , 15 A.3d at 382 ; Robinson , 82 A.3d at 1015. At bottom, Brown's ineffectiveness claim takes issue with Dr. Tepper's performance, not with that of trial counsel.[14]
In his dissenting opinion, the Chief Justice contends that the PCRA court erred in not granting Brown an evidentiary hearing to develop a more complete factual record. In so doing, the Chief Justice relies exclusively on a single paragraph in the affidavit of Attorney Rendine which indicates that there was "no technical or strategic reason why neuropsychological testing was not done" in light of Dr. Moberg's report. Dissenting Op. at 198. The Chief Justice suggests that trial counsel likely knew what the word "organicity" in Dr. Moberg's report meant and thus should *157 have independently concluded that neuropsychological testing was necessary. Id.
The PCRA court did not abuse its discretion with respect to the denial of an evidentiary hearing on this issue. The record establishes that Dr. Tepper reviewed Dr. Moberg's findings prior to trial, determined that those findings were significant enough to discuss them with counsel, and yet did not recommend to counsel that any neuropsychological testing be administered.[15] PCRA Petition, Appendix, Tepper Affidavit, ¶¶ 11-13; PCRA Petition, Appendix, Rubino Affidavit, ¶ 9. This failure to recommend further testing is explained by Dr. Tepper's testimony at trial the next day, where he indicated that Dr. Moberg's report contained "no findings of any significant brain injury." N.T., 6/1/2005, at 235. The Chief Justice does not refer us to any authority requiring trial counsel to disregard the medical opinions of his or her retained expert witness and to instead act independently based upon counsel's own untrained observations of possible "red flags" in order to provide effective assistance of counsel. See generally Commonwealth v. Bracey , 568 Pa. 264, 795 A.2d 935, 942-43 (2001) ("[C]ounsel was not required to disregard the findings of his expert and continue to consult experts, at the expense of limited judicial resources, until he found one willing to testify that Appellant was organically brain damaged or manifested some kind of major mental illness."). Lesko and Robinson hold directly to the contrary, i.e., that an ineffectiveness claim cannot be based upon an assertion that counsel failed to spot a "red flag" that the mental health expert failed to spot.[16] Lesko , 15 A.3d at 382 ; Robinson , 82 A.3d at 1015. In this regard, we note that the record here, including the affidavits of Attorneys Rendine and Rubino, contains no evidence to suggest that either trial counsel was schooled in mental health matters, and neither Brown nor the Commonwealth have suggested that trial counsel had received any formal training in this area sufficient to disregard Dr. Tepper's advice and instead act independently.[17] In *158 her affidavit, Attorney Rubino testified that she was relying on Dr. Tepper's expertise, since if he had recommended further testing she would have sought court funding to obtain it, and that if Dr. Tepper had identified any evidence that Brown had brain damage, she would have presented it to the jury. PCRA Petition, Appendix, Rubino Affidavit, ¶ 9.
For these reasons, we conclude that the PCRA court did not err in denying Brown relief on Claim VI of his PCRA petition without an evidentiary hearing. Brown did not raise a genuine issue of fact which, if resolved in his favor, would have entitled him to relief. The factual record is sufficiently developed to support the PCRA court's ruling that trial counsel acted reasonably in hiring a qualified mental health expert and relying upon his advice (or lack thereof) with respect to the need for neuropsychological testing. No relief is due on this claim.
b. Mitigation evidence from lay witnesses
We next consider Brown's claim that trial counsel was ineffective for failing to adequately interview certain lay witnesses, including various family members and friends. According to Brown, more thorough work in this area would have disclosed additional mitigation evidence not presented at the penalty phase of his trial, including the severe neglect and emotional abandonment by his mother and his displayed passivity and developmental delay as a child. Brown's Brief at 58. Specifically, Brown contends that trial counsel failed to present evidence of his mother's ongoing depression and that she wanted to place Brown and his brother in foster care. He asserts that trial counsel should have presented a former babysitter, Janet Peterson, to testify about his lack of social engagement as a young child. Id. at 71. He adds that "[e]arly hospital records" would have demonstrated his "lack of engagement" as a young child. Id. at 72. Also, according to Brown, trial counsel failed to elicit testimony from his grandmother regarding an incident that prompted the grandparents to remove Brown from his mother's household. Id. According to Brown, his grandmother would have testified that she observed Brown's stepfather beating Brown with a wiffle ball bat. Id.
Our evaluation of counsel's performance with respect to the investigation and presentation of mitigating evidence is highly deferential, and the reasonableness of counsel's decisions cannot be based on the distorting effects of hindsight. Commonwealth v. Mason , 634 Pa. 359, 130 A.3d 601, 647 (2015) (citing Commonwealth v. Bridges , 584 Pa. 589, 886 A.2d 1127, 1132 (2005) ). The PCRA court is "to develop a specific comparison of the mitigation case offered at trial with the credited evidence offered on post-conviction review...." Commonwealth v. Beasley , 600 Pa. 458, 967 A.2d 376, 391 (2009). In reviewing the PCRA court's determination, "we reweigh the evidence in aggravation *159 against the totality of available mitigating evidence, which includes the evidence presented at the penalty hearing and the evidence that would have been presented had counsel conducted a proper investigation." Commonwealth v. Gibson , 610 Pa. 332, 19 A.3d 512, 526 (2011).
We begin by reviewing the mitigation evidence that trial counsel actually presented at trial. Asenath Brown ("Asenath"), Brown's mother, testified about Brown's troubled childhood, including the fact that her son was born with a severe clubfoot and underwent multiple surgeries, requiring him to use a walker or a wheel chair at times. N.T., 6/1/2005, at 93-95. Brown had difficulty standing and walking and could not run or participate in normal activities as a child. Id. When Brown was seven years old, Asenath informed Brown that a man named James Dewitt, whom Brown had never met, was Brown's biological father. Id. at 96. Prior to that time, Asenath misled Brown into believing someone else was his father. Id. at 97.
When Brown was three years old, Asenath married Barry Mosey ("Stepfather"), an alcoholic who repeatedly beat Brown between the ages of three and seven. Id. at 98-99. Asenath recalled an incident when Stepfather arrived home drunk and slammed Brown against a wall. Brown suffered abrasions and bruises and had to go to the hospital. Id. at 99. According to Asenath, she did nothing to protect her children because she had to protect herself from Stepfather. Id. at 100-01. She admitted to beating Brown with a belt when he was a child. Id. at 103. At age seven or eight, after Brown's grandmother witnessed Stepfather beating Brown, Brown went to live with his grandparents. Id. at 102. While living with the grandparents, Brown's grandfather occasionally ordered Brown to strip so grandfather could beat him with an ironing cord as discipline. Id. at 112.
Brown is dyslexic and had to repeat grades two through four. Id. at 105-06, 109-10. Asenath testified that children at school teased Brown, calling him names such as "Blacky, Dark boy, [and] Tar Baby." Id. at 107. At age sixteen, Brown attended George Junior Republic School in Grove City until he turned eighteen. Id. at 114. Thereafter, Brown moved back home with his mother. Id. at 115. At age nineteen, he moved in with his girlfriend, Lisa Barber, with whom he shares two children. Id. at 116. According to Asenath, Brown eventually obtained his GED and attended community college. Id. at 128.
Azalee Brown ("Grandmother"), Brown's maternal grandmother, similarly testified about Brown's difficult childhood, including his club foot, surgeries, and the teasing that he endured. Id. at 135-36. She acknowledged that Brown's grandfather physically punished Brown. Id. at 140. When Brown was seven or eight, she tutored him and observed improvement in his school work. Id. at 138. She expressed her belief that Brown is of average intelligence. Id. at 148.
Vanessa Edwards ("Edwards"), a close friend of Brown's mother who has known Brown since he was a child, also relayed the difficulties Brown endured due to his club foot. Id. at 157-58. Brown and her son, Darien were very close. After Darien was murdered, Brown comforted her. Id. at 161. Edwards testified that she did not observe any noticeable emotional problems and believed that Brown was capable of conforming his conduct to law. Id. at 160, 166.
Fatima Hashim ("Hashim"), who was nineteen years old at the time of trial, shares a one year old son with Brown. Id. at 170. According to Hashim, she had a good relationship with Brown and never *160 found him to be a violent person. Id. at 171. She believed that Brown understood the difference between right and wrong. Id. at 175. She never observed anything that would lead her to believe that he was emotionally or mentally disturbed. Id. at 176.
Brown's grandfather, Raymond Brown ("Grandfather") recalled Brown's club foot and the surgeries that negatively impacted his childhood. Id. at 181. According to Grandfather, Brown was "kind of slow" and his dyslexia was an obstacle. Id. at 182. Grandfather and Grandmother insisted that Brown live with them because of Stepfather's verbally and physically abusive behavior. Id. at 184-85. Grandfather admitted to occasionally disciplining Brown by beating him with a belt for things like skipping school. Id. at 185. Grandfather testified that he ordered Brown to remove all clothing before the beatings he inflicted because it was psychologically embarrassing. Id.
Thomas Dulin ("Dulin") testified that in 1996, he was involved in a program called "More Opportunity and Responsibility to Develop Yourself." N.T., 6/2/2005, at 24. During that time, Dulin lived in Northeast Philadelphia and served as a case manager and a proxy for program participants who were placed to live with him and his family. Through the program, Brown lived with Dulin for about one year from 1996-97. Id. at 25. Dulin provided Brown with a stable environment and testified that Brown never gave him any problems. Dulin testified that "the Lavar I knew then I would have never expected to be here today in this situation." Id.
LaChe Brown ("LaChe"), Brown's older brother, testified about the abuse Stepfather inflicted. Stepfather used a wiffle ball bat as a weapon. Id. at 36. According to LaChe, their mother never protected them, nor did she ever spend any time with Brown. Id. at 37. Brown was often teased and got into a lot of fights. Id. at 39.
Based upon this testimony as well as that from Dr. Tepper, the PCRA court, as per its obligation to do so, compared the mitigation case actually offered at trial with the credited evidence offered on post-conviction review:
[Brown] claims that trial counsel failed to adequately interview [his] family members and friends, either in a timely fashion or not at all. [Brown] claims that, as a result of this, counsel failed to uncover evidence of his mother's depression, evidence that she wanted to place [Brown] and his brother in foster care, evidence that [Brown] was "unusually passive" as a child, evidence that everyone in his grandmother's household "got beat," and evidence that [Brown] had favorably adjusted to prison. Because the absence of this information did not prejudice [Brown], this claim fails.
In light of all of the evidence heard at the sentencing phase of [Brown's] trial ... [Brown] was not prejudiced by counsel's failure to discover this additional information. At the penalty phase, the jury heard from [Brown's] psychological expert, as well as from a number of his family members and close friends. The jury heard that, as a child, [Brown] had a club foot and had to undergo many painful surgeries and, as a result, did not walk properly. [Brown] was physically abused by his step-father, and his mother did nothing to intervene. The jury heard that the abuse got so bad that [Brown] was hospitalized and had to go live with his grandparents, where he was also subjected to physical abuse by his grandfather when he was disciplined. The jury heard about [Brown's] learning disabilities, his dyslexia, and the fact *161 that [Brown] had to repeat a number of grades in elementary school. Finally, the jury heard from Dr. Tepper, who spent hours evaluating [Brown] and his family members, who reviewed voluminous records, and who, despite all of [Brown's] history, opined that [Brown] did not suffer from any substantial brain injury. In light of all of this testimony, the outcome would not have been any different had the jury heard this additional information, and the claim fails.
Rule 907 Notice, 4/7/2016, at 52-53.
Based on our review of the entirety of the certified record on appeal, we agree with the PCRA court's comparison and conclusion. The evidence that Brown now contends should have been introduced is largely cumulative of the evidence that was in fact presented at the penalty phase of the trial. The minimal additional mitigation evidence identified by Brown during post-conviction review provides little or no basis for concluding that the outcome of the sentencing proceeding would have been different if trial counsel had presented this additional evidence to the jury. Finding no error in the PCRA court's determination, we grant no relief on this claim.
c. Brown's prison behavior
Finally, Brown asserts that trial counsel was ineffective for neglecting to present evidence that he had no violent infractions while housed in state prison. This evidence would have showed that he was "a well-behaved and well-adjusted prisoner." Brown's Brief at 73. This claim fails because the record reveals that Dr. Tepper reviewed Brown's prison records and testified that Brown had no serious infractions while in prison. N.T., 6/1/2005, at 232-33. Thus, the jury was aware of this information.
For these reasons, we conclude that the PCRA court did not err in denying Brown's Claim VI.
Brown and the Commonwealth rely on the argument that the PCRA court erred in its ruling on Brown's Claim VI to support a merits basis for the Joint Motion. Since we conclude that the PCRA court did not err in this regard, the Joint Motion is denied.
Guilt Phase Issues
Having denied the Joint Motion, we turn to consideration of the guilt phase issues that Brown raised in his PCRA petition.
I. Eyewitness Testimony
Brown's first issue consists of four distinct arguments, all relating to trial counsel's alleged ineffective assistance with respect to the eyewitness testimony presented by the Commonwealth at trial. Brown challenges (a) trial counsel's failure to hire a forensic investigator; (b) trial counsel's failure to request a Kloiber charge with respect to Smith and to object to an allegedly defective Kloiber charge with respect to Ellison; (c) trial counsel's ineffective cross-examination of Ellison regarding her in-court identification of Brown; and (d) trial counsel's failure to present the eyewitness testimony of Gonzalez.
a. Trial counsel's failure to hire a forensic investigator
Brown first asserts that trial counsel should have retained a forensic investigator to offer testimony that could have been used to impeach the damaging eyewitness testimony of Smith and Ellison. Both Smith and Ellison testified that they were a mere three to five feet away from Brown when they saw him shoot Crawford. Brown's PCRA counsel hired a forensic investigator, Robert Tressel ("Tressel") to *162 visit the crime scene and review affidavits, crime scene photographs, discovery and transcripts. Tressel visited the crime scene on December 12, 2013 and provided a signed affidavit expressing his professional findings. PCRA Petition, Appendix, Tressel Affidavit, 12/12/2013, ¶ 2. Based upon the locations of the three fired cartridge casings and his knowledge of the type and brand of the murder weapon, Tressel opined that the shooter fired from between seven to nine feet from the curb on the west side of Watts Street, and based upon the trial testimony and a subsequently obtained affidavit from Ellison, he further opined that the minivan where Smith and Ellison were located was between fifty and fifty-three feet from the Watts Street west side curb. Id. , ¶¶ 3-6. As a result, Tressel indicated that if he had been retained to testify on behalf of Brown at trial, he would have informed the jury that Smith's minivan was between forty to forty-six feet from the shooter, rather than just three to five feet away as Smith and Ellison both testified. Id. , ¶¶ 7-8.
This claim fails because Brown cannot establish either that trial counsel lacked a reasonable strategic basis for his actions or that Tressel's testimony would have impacted the trial's outcome. As indicated hereinabove, with respect to the reasonable strategic basis element of an ineffectiveness claim, the issue is not whether there were other courses of action that counsel could have pursued, but whether the course taken had any reasonable basis. Hanible , 30 A.3d at 439. In this case, trial counsel did not hire a forensic investigator to establish the apparent disparity in the distance that Smith and Ellison were from the shooting and their testimony regarding the same. Instead, trial counsel chose to attempt to refute their testimony through both cross-examination and the use of the testimony of other witnesses (including the Commonwealth's own forensic investigators). In multiple cases, this Court has held that "[t]rial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony." Commonwealth v. Chmiel , 612 Pa. 333, 30 A.3d 1111, 1143 (2011) ; see also Commonwealth v. Treiber , 632 Pa. 449, 121 A.3d 435, 454 (2015) ; Commonwealth v. Copenhefer , 553 Pa. 285, 719 A.2d 242, 253 (1998) ; Commonwealth v. Williams , 537 Pa. 1, 640 A.2d 1251, 1265 (1994). In Hanible , we rejected a substantially identical claim as that presented here, involving a contention that trial counsel should have hired Tressel to testify regarding the precise location of a van. We did so because "trial counsel cannot be deemed ineffective for failing to obtain the opinion of an independent crime scene expert when the forensic investigators who actually examined the scene obtained evidence favorable to Appellant, which trial counsel utilized in his cross-examination of the Commonwealth's witnesses." Hanible , 30 A.3d at 449.
As the PCRA court here observed, and the certified record reflects, trial counsel ably cross-examined Smith and Ellison regarding their claims of proximity to the shooter. Also, and importantly, during his cross-examination of Rahill, the Commonwealth's forensic crime scene investigator, trial counsel successfully utilized the witnesses' various marks on the Diagram to demonstrate that Smith and Ellison were considerably further away from the shooting than they believed. Rahill testified that, assuming the witnesses accurately marked their locations on the Diagram, Smith and Ellison were 160 feet to 240 feet away from where Anderson marked his location on the Diagram. Rahill also testified that the distance from where the fired shell casings were found and where Crawford fell was approximately 110 feet from *163 Smith and Ellison. Trial counsel reiterated in his closing argument that neither Smith nor Ellison were as close to the shooting as they testified. N.T. 5/31/2005, at 114, 119-20. Based upon these concessions, we cannot conclude that trial counsel's chosen strategy lacked a reasonable basis.
Rahill's testimony also reflects that the failure to hire Tressel to testify at trial did not prejudice Brown, as it would not have resulted in a different outcome at trial. Rahill's testimony was significantly more favorable to Brown than Tressel's would have been. Tressel would have testified that Smith and Ellison were a mere forty to forty-six feet from the shooter, while Rahill told the jury that (based on the Diagram) Smith and Ellison were between 160 and 240 away from Anderson, who in turn testified that he was six feet away from Brown when the shots were fired. The jury heard Rahill's testimony, but still chose to find Brown guilty, as it either chose to believe Smith and Ellison instead or did not find the discrepancy in distance to be material to their decision.
b. Kloiber charges
Brown next argues that trial counsel was ineffective for failing to request a Kloiber charge with respect to Smith and Ellison. A Kloiber charge is appropriate when the accuracy of the testimony of an eyewitness' identification is "so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution." Commonwealth v. Kloiber , 378 Pa. 412, 106 A.2d 820, 826-27 (1954). A trial judge must provide the instruction "where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past." Commonwealth v. Ali , 608 Pa. 71, 10 A.3d 282, 303 (2010). A Kloiber charge is not mandatory "[w]here an eyewitness has had 'protracted and unobstructed views' of the defendant and consistently identified the defendant 'throughout the investigation and at trial.' " Id. (quoting Commonwealth v. Dennis , 552 Pa. 331, 715 A.2d 404, 411 (1998) ).
With respect to Smith, the trial court determined that no Kloiber instruction was necessary. Brown challenges the failure of trial counsel to object on two grounds. First, Brown asserts that the distance between Smith and the shooting (approximately forty feet, using Tressel's estimate) left her in a location where it was difficult to get a clear look at the shooter. Brown's Brief at 13. Second, he states that there were inconsistencies in her identification testimony over time. Id. at 13-14. In this regard, Brown asserts that Smith testified that Crawford was shot in the chest, but the medical examiner's testimony revealed that Crawford was shot in the back. Brown also argues that Smith stated at the preliminary hearing that she lost sight of the shooter, but at trial she said she never lost sight of him. Id. at 12. Finally, he contends that in her police statement, Smith stated that she heard four shots, but her testimony regarding the number of shots she heard varied at trial. Id. at 12.
Neither argument is meritorious. With respect to the first argument, we have reviewed the apparent discrepancies regarding Smith's distance from the shooter. Smith's trial testimony was unequivocal - that she was four to five feet away from the shooter (close enough to see the blue light emitting from the silver handgun), and that at no time did anything obscure her unobstructed view of Brown's face. N.T., 5/25/2005, at 51. Because Smith had "protracted and unobstructed views" of the defendant and consistently identified the defendant "throughout the investigation and at trial," there was no need for a *164 Kloiber instruction. See, e.g., Dennis , 715 A.2d at 411.
In support of his contrary assertion, Brown cites to two prior Superior Court decisions, Commonwealth v. Simmons , 436 Pa.Super. 203, 647 A.2d 568 (1994), and Commonwealth v. McKnight , 307 Pa.Super. 213, 453 A.2d 1 (1982). We agree with the Commonwealth that those cases have no application in the present circumstance, as they both involved situations where the evidence at trial established that the witnesses had only an obstructed view of the relevant events. See Simmons , 647 A.2d at 570 ("There was testimony offered at trial that the shed door could not be seen at all from the location at which the witness claimed he was standing at the time of the crime, and there was evidence that a person leaving from the side door could not be clearly seen."); McKnight , 453 A.2d at 2 ("he never saw more than a profile of any of the three").
With respect to Brown's second argument, Brown has at best identified certain discrepancies in Smith's identification testimony over time This Court has never required a Kloiber charge, or found counsel ineffective for failing to request one, merely because a witness was uncertain about, or inconsistent with, certain details of the crime. See, e.g., Commonwealth v. Reid , 627 Pa. 78, 99 A.3d 427, 449 (2014) ("[T]he need for a Kloiber charge focuses on the ability of a witness to identify the defendant.") (emphasis in original); Ali , 10 A.3d at 303 ; Commonwealth v. Paolello , 542 Pa. 47, 665 A.2d 439, 455 (1995) (no Kloiber charge required where inconsistencies in testimony go to witness credibility rather than physical ability to observe the incident). Smith testified that she had an unobstructed view of Brown's face at the time of the shooting, when he ran past, and when she identified him at the time of his arrest. She also never equivocated in her identification of Brown or failed to identify him on any occasion prior to trial. As none of the Kloiber factors are present with respect to Smith, Brown's claim of ineffectiveness on this ground is meritless.
We agree with Brown that Ellison's inconsistency in her identification of him at trial, as detailed hereinabove, necessitated a Kloiber charge for this witness. No basis exists for an ineffectiveness claim, however, as the trial court in fact provided such a cautionary instruction to the jury:
In her testimony Christina Ellison identified the defendant as the person who committed the crime. There could be a question in this case of whether this identification is accurate. A victim or other witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that a jury must receive it with caution. Identification testimony must be received with caution if the witness in her testimony is not positive as to identity or if the witness'[ ] positive testimony as to identity is weakened by not identifying the defendant when first asked if she saw in this courtroom the person whom she saw do the shooting. If you believe that either or both of these factors is present in this case, then you must consider with caution the testimony of Christina Ellison identifying the defendant as the person who committed the crime. If, however, you do not believe that either of these factors is present, then you need not receive the testimony from Christina Ellison with caution. You may treat it like ordinary testimony, as a statement of fact. You should consider all evidence relevant to the question of who committed the crime, including the testimony of Christina Ellison. You cannot find the defendant guilty unless you are satisfied, *165 beyond reasonable doubt, by all the evidence, direct and circumstantial, not only that the crime was committed, but that it was the defendant who committed it.
N.T., 5/31/2005, at 196-98 (emphasis added).
Brown contends that trial counsel was ineffective for failing to object to the bolded portion of the instruction on the grounds that once it is determined that a Kloiber charge is necessary, the trial court has an obligation to instruct the jury that it must receive Ellison's identification testimony with caution, rather than leaving it up to the jury to consider how much weight the identification testimony deserves. Brown's Brief at 16 (citing Kloiber , 106 A.2d at 826-27 ). A review of the record, however, reveals that trial counsel did object:
[Trial Counsel]: I believe when you were talking about the identification of Christina Ellison, that you - that you - what I wrote down that you said was [that if Ellison identified Brown]; you should believe the testimony of [Ellison]. I believe what you meant to say was that if you believe that she failed to identify him, you should treat the - the testimony of [Ellison] with caution.
[the charge was read back by the court reporter]
[Trial Counsel]: That's right, Judge. I kind of misheard. It sounded like the way I heard it, it was disjointed. But you did say it; there's no doubt about it.
The Court: Okay.
[Trial Counsel]: But I would like to say this, Judge: That I kind of think that charge, the way you gave it, you came out and said that [Ellison] identified [Brown] in court. The whole purpose of the charge is to emphasize that she failed to identify him in court. And I'm not too sure that the way that charge is read as a whole -
The Court: Well, she didn't fail to identify him.
[Trial Counsel]: Well, she did at first.
The Court: Well, then she ended up identifying. That's how I gave it .... Your objection is noted.
N.T., 5/31/2005, at 204-08.
Accordingly, trial counsel did object to the trial court's instruction, arguing that the trial judge had wrongly advised the jury that it could ignore the Kloiber charge if it concluded that Ellison was positive in her identification of Brown and that her subsequent positive identification (on redirect examination) was not weakened by her prior failure to identify him when she was asked (on direct examination) if she saw the shooter in the courtroom. Accordingly, this claim of ineffectiveness is meritless.[18]
c. Cross-examination of Ellison
Brown's next claim focuses on trial counsel's cross-examination of Ellison. As indicated hereinabove, during direct examination, when asked whether she saw the shooter in the courtroom, Ellison responded that she did not know. N.T., 5/25/2005, at 149-50. Brown contends that on cross-examination, trial counsel, by using the phrase "my client" to refer to the man the police brought back in handcuffs to Smith's minivan for identification, opened the door to permit the Commonwealth, on redirect examination, to give Ellison a second opportunity to identify Brown as the shooter. This claim relies on *166 the following excerpts from Ellison's trial testimony, the first of which is from her cross-examination by trial counsel:
[Trial Counsel]: Okay. After it happened, you did see my client in custody; is that correct?
[Ellison]: Yes.
[Trial Counsel]: And he was brought in handcuffs and put in a police car; is that what happened?
[Ellison]: Yes.
* * *
[Trial Counsel]: [Y]ou and Ms. Smith were down on the south side of Girard Avenue where you showed the jury?
[Ellison]: Yes.
[Trial Counsel]: Police come by with my client; correct?
[Ellison]: (Nods head)
[Trial Counsel]: And were you with Ms. Smith then?
[Ellison]: Yes.
[Trial Counsel]: Where were you and Ms. Smith at that time? Were you still in the car or were you--
[Ellison]: We were still in the car.
[Trial Counsel]: Okay. And is that the only time that you saw him after this incident?
[Ellison]: Yes.
Id. at 184-85 (emphasis added). This line of inquiry led to the following exchange between the prosecutor and Ellison during redirect examination:
[Commonwealth]: [Trial counsel] stood up. And one of the first things that he asked you was: You did see my client in custody? Do you remember him saying that?
[Ellison]: Yes.
[Commonwealth]: Okay ... when he said "my client," you looked over at his client; correct?
[Trial Counsel]: Objection, Your Honor.
The Court: Overruled.
[Ellison]: Yes.
* * *
[Commonwealth]: And then, after looking at him, you said, Yes?
[Ellison]: Yes.
* * *
[Commonwealth]: Why did you say "yes"?
[Ellison]: Because I recognized him.
[Commonwealth]: You recognized him as you sit here?
[Ellison]: Yes.
[Commonwealth]: Do you recognize him as the guy who shot that other guy you didn't know?
[Ellison]: Yes.
[Commonwealth]: Then why in the world, when I first asked you, did you tell the jury that you don't know if it's him?
[Ellison]: Because I didn't look at him as good as I see him now.
[Commonwealth]: Okay. I want you to take a good, long look at him right now, please.
* * *
[Commonwealth]: Okay. Is that the guy-- I'm pointing to the defendant in the brown or beige jacket -- who tried to get your number that time?
[Ellison]: Yes.
[Commonwealth]: Is that the guy you saw at least a couple of times in the year prior to the shooting hang out in the area of Watts and Girard?
[Ellison] : Yes.
[Commonwealth] : Is that the guy who was talking to the guy who's now dead?
[Ellison]: Yes.
[Commonwealth]: Is that the guy whose face you saw as he fired approximately four bullets into the man?
*167 [Ellison]: Yes.
[Commonwealth]: Is that the guy who was running away?
[Ellison]: Yes.
[Commonwealth]: Is that the guy who then ran back towards you on the south side of the street and passed you?
[Ellison]: Yes.
[Commonwealth]: Is that the guy the police brought back?
[Ellison]: Yes.
Id. at 212-15.
Brown now argues that trial counsel's reference to "my client" as the person the police brought back to Smith's minivan in handcuffs presumed a fact not in evidence, namely, that Brown was the man in handcuffs. Brown's Brief at 22. Brown maintains that trial counsel's cross-examination "established that missing link," and that absent this error, "the door would not have been opened to the prosecution's inquiry on redirect which resulted in her repeated identification of [Brown] as the shooter." Id. Brown insists that this "harmful identification" was highly prejudicial, as during closing arguments the Commonwealth emphasized Ellison's identification as one of three people (along with Smith and Sutton) who identified Brown in court as the shooter. Id. at 22-23.
We discern no error in the PCRA court's determination that Brown failed to demonstrate that trial counsel's remark prejudiced him. Rule 907 Notice, 4/7/2016, at 18. While Ellison did not identify Brown "directly" during her direct examination, she did do so indirectly. She testified on direct that the shooter was the man the police brought to Smith's minivan for identification. N.T., 5/25/2005, at 172-80. The jury also heard both Smith and Anderson testify that the shooter was the man the police brought back in handcuffs, and these witnesses also both testified that Brown was that man. In addition, Officer Sharrod Davis, who chased Brown on foot immediately after the shooting, positively identified Brown and verified that Brown was the person who police arrested and brought back to the scene in handcuffs. N.T., 5/26/2005, at 142, 154, 163. As a result, Ellison's testimony on direct, when combined with evidence presented by other witnesses, established Ellison's "indirect" identification of Brown as the shooter. As a result, her eventual identification on redirect examination was not prejudicial to Brown. This claim is therefore meritless.
d. Failure to call Janell Gonzalez as a witness
Brown next argues that trial counsel was ineffective for failing to call Gonzalez as a trial witness, as he contends that her description of the shooter would have undermined the descriptions of the shooter provided by Smith and Ellison. To prove that trial counsel provided ineffective assistance for failing to call a witness, a petitioner must demonstrate:
(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.
Washington, 927 A.2d at 599.
In a 2013 affidavit provided to Brown's counsel, Gonzalez indicated that if she had been subpoenaed to testify, she would have done so. PCRA Petition, Appendix, Gonzalez Affidavit, 11/7/2013. She further indicated that her best recollection of the events of the day in question would have been included in the statement she gave to the police. Id.
*168 This ineffectiveness claim fails because Brown does not establish that trial counsel's decision not to call Gonzalez to testify prejudiced him. Gonzalez's testimony would likely have differed from that of Smith and Ellison in the following respects: (1) Gonzalez described the shooter as being five-feet eight inches tall, while Ellison testified that he was five feet ten to five feet eleven inches tall; (2) Gonzalez indicated that the shooter wore a white skully cap, but neither Smith nor Ellison referenced a cap; and (3) Gonzalez said that the shooter was wearing blue jeans, while Ellison testified that the shooter wore camouflage pants.
Gonzalez's testimony on these points, however, was substantially identical to that of Sutton, with whom she was walking towards the gas station when the shooting occurred. In her statement to police, Gonzalez described the shooter as "a black male, about 19 years old, about your height or a little smaller [five feet eight inches], dark brown skin, wearing a black waist length jacket, blue jeans, a white hat or skullie [sic]." PCRA Petition, Appendix, Gonzalez Police Statement, 12/10/2003. Sutton testified at trial that when she heard gunshots, she saw a man "in a white skully and like a black jacket and some blue jeans" shoot the victim, and that the shooter was dark skinned and about five feet seven to five feet nine in height. N.T., 5/27/2005, at 16.
During closing arguments, trial counsel highlighted the differences between Sutton's testimony regarding a white skully cap, in contrast to Smith's failure to recollect whether the shooter was wearing a hat at all. N.T. 5/31/2005, at 100-03. Because Gonzalez's testimony on these points would have been almost entirely cumulative of Sutton's actual trial testimony, it would have contributed little or nothing to trial counsel's efforts to call into question the discrepancies between the recollections of the various eyewitnesses. Absent any prejudice, this claim fails.
II. Impeachment of Anderson
For his second issue, Brown raises four claims related to trial counsel's alleged failure to effectively impeach Anderson: (a) trial counsel failed to impeach Anderson with evidence of pending drug charges in New Jersey; (b) trial counsel failed to impeach Anderson with evidence of his juvenile criminal history; (c) the Commonwealth violated Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, (1963), by failing to disclose information related to Anderson's juvenile criminal history; and (d) trial counsel failed to present Justin Akines-Harris as a witness to impeach Anderson.
a. Anderson's pending drug charges
Brown argues that trial counsel should have cross-examined Anderson more extensively with evidence of Anderson's pending drug charges in New Jersey to demonstrate that Anderson's trial testimony was motivated by his desire to curry favor from the prosecution. Brown claims that prior to trial, New Jersey prosecutors engaged in plea negotiations with Anderson. Brown's Brief at 29. On June 6, 2005, after Brown's trial concluded, Anderson pleaded guilty to "failure to make a required disposition," a reduced charge, in exchange for a probationary sentence. See PCRA Petition, Appendix, Anderson Plea Form, 6/6/2005. Brown suggests that New Jersey prosecutors offered Anderson a more lenient sentence in exchange for his cooperation in Brown's murder trial. Brown's Brief at 29-30. According to Brown, trial counsel never uncovered these details because he failed to obtain Anderson's complete criminal file from New Jersey. Id. at 30.
*169 The PCRA court concluded that Brown's claim fails because he did not suffer prejudice. Rule 907 Notice, 4/7/2016, at 19. In support, the PCRA court reasoned that further investigation by trial counsel would not have altered the outcome of Brown's trial, as evidence of Anderson's pending charges was thoroughly elicited. Id. Further, Anderson did not officially plead guilty until after Brown's jury trial, and there was "no evidence to suggest that Anderson accepted any plea agreement prior to his trial testimony." Id. at 20. The PCRA court added that it provided clear instructions to the jury as to how they should consider Anderson's pending charges.
The PCRA court's conclusions are supported by the record. The record reveals that evidence of Anderson's open criminal matter in New Jersey was provided to the jury. The Commonwealth first questioned Anderson on this topic as follows:
[Commonwealth]: Now, Mr. Anderson, you currently have an open arrest; correct?
[Anderson]: Yes.
[Commonwealth] : In New Jersey, actually?
[Anderson]: Yes.
[Commonwealth] : And you are - have you gone to trial yet?
[Anderson]: I'm still - it's still pending right now.
[Commonwealth]: Okay. And you were charged with possession of narcotics with the intent to deliver; right?
[Anderson]: Yes.
[Commonwealth]: Either with having enough drugs or with drug dealing; correct?
[Anderson]: Yes.
[Commonwealth]: And there's a conspiracy charge, too; right?
[Anderson]: Yes.
[Commonwealth]: Have the police in New Jersey or the police here or me or anybody from a District Attorney's Office made you any promises on that case --
[Anderson]: No.
[Commonwealth]: -- in order to -- let me finish -- in order to get you to testify here today?
[Anderson]: No.
[Commonwealth]: As you sit here, do you expect that my office or the Philadelphia Police Department will help you beat that case or help you get a light sentence of anything like that?
[Anderson]: No.
[Commonwealth]: Have any written or oral deals been made with you?
[Anderson]: No.
N.T., 5/26/2005, at 57-58. Trial counsel then cross-examined Anderson about the pending charges:
[Trial Counsel]: You ... currently have an open case in New Jersey for possession with intent to deliver narcotics; correct:
[Anderson]: Yes.
[Trial Counsel]: And do you know what the maximum sentence you could receive in that case is?
* * *
[Anderson]: Three to five.
[Trial Counsel]: Three to five--
[Anderson]: Yes.
[Trial Counsel]: - years' incarceration; correct?
[Anderson]: Yes.
[Trial Counsel]: Did the ... Philadelphia D.A.'s Office, by any representative, tell you that if you testified, they would help you favorably resolve your New Jersey case?
[Anderson]: No.
*170 [Trial Counsel]: Did anyone from the police tell you that?
[Anderson]: No.
[Trial Counsel]: Did any detective tell you that they would appear at your sentencing if you were convicted in New Jersey and inform the [c]ourt that you had cooperated in a homicide investigation in Philadelphia?
[Anderson]: No.
[Trial Counsel]: Never discussed that with any members of the law enforcement community?
[Anderson]: No.
[Trial Counsel]: Do you have a lawyer that represents you in New Jersey?
[Anderson]: I have a Public Defender.
[Trial Counsel]: Did you ever discuss with your Public Defender that you expected favorable treatment from the authorities in Philadelphia if you helped them prosecute this homicide case?
* * *
[Anderson]: No.
Id. , at 64-66. The trial court then advised the jury as follows:
Regarding that case, I will tell the jury that in my initial instruction to you or part of what the instructions are to you is that charges are only charges. You may have heard me say that to you and that just because someone is arrested, it does not mean that they are guilty of anything.
The only reason that it is permitted to be brought out at all that this witness had an open case is so that the jury can evaluate for itself whether the fact that this person has this open case, were they at all testifying here in such a manner as to try to curry favor with the prosecution. Whether the prosecution had offered them anything or not, is this something that perhaps might be in their head and that that would, therefore, make them or lead them to perhaps tailor their testimony in any way.
And so that's why it's brought out, so that the jury can evaluate all of that as they decide who and what to believe.
Id. , at 114-15. During the jury charge, the trial court also provided the following instruction:
You have heard evidence that Rahsaan Anderson has an open case in New Jersey. Whenever a prosecution witness ... may be biased in favor of the prosecution because of outstanding criminal charges within the same jurisdiction, that possible bias must be made known to the jury, as was done in this case.
Even if the prosecution has made no promises on the present case or on other pending criminal matters, the law recognizes that the witness may hope for favorable treatment from the prosecutor if the witness presently testified in a way that is helpful to the prosecution.
It is for you, the jury, to consider whether such bias in favor of the prosecution exists in this case regarding Rahsaan Anderson's testimony and what weight, if any, you attach to it.
N.T., 5/31/2005, at 195-96.
Brown contends that trial counsel's cross-examination was incomplete, as Anderson had been charged with, inter alia, five counts of intent to distribute cocaine, four carrying maximum sentences of three to five years of incarceration and the fifth carrying a maximum sentence of eighteen months. Brown's Brief at 29. Several of these charges involved drug transactions in a school zone, which carried mandatory minimum sentences. Id. Moreover, Anderson did not disclose that he had been offered a plea deal (probation in exchange for pleading guilty to a single count in the indictment). Id. Anderson formally accepted the plea offer on June 6, 2005, eleven *171 days after Brown's trial concluded. Id. In exchange for his plea, Anderson received two years of probation. Id. at 30. According to Brown, reasonable investigation would have led trial counsel to this additional information, which would have resulted in a more effective cross-examination of Anderson. Id.
Other than speculation, Brown presented no evidence that prosecutors (either in Pennsylvania or New Jersey), offered Anderson a plea agreement in exchange for his testimony against Brown. Anderson provided his statement to police inculpating Brown on the night of the shooting, well before he was arrested and charged with crimes in New Jersey in October 2004, and his testimony (that Brown shot Crawford) remained unchanged thereafter. The PCRA court found that Brown had not demonstrated any prejudice associated with this claim, as it "was brought out on direct and cross-examination that Anderson was facing drug charges - possession of narcotics, possession of narcotics with intent to deliver, and conspiracy - in New Jersey. The jury was even instructed on how to consider Anderson's open case." Rule 907 Notice, 4/7/2016, at 20-21. Because Brown fails to establish that trial counsel's alleged derelictions impacted the verdict, this claim fails.
b. Anderson's juvenile adjudications
Next, Brown claims that trial counsel failed to impeach Anderson with evidence of his juvenile criminal history, which consisted of a 2000 adjudication for burglary and a 2001 adjudication for receiving stolen property, both in Montgomery County. Although the Commonwealth provided trial counsel with Anderson's FBI excerpt, the excerpt identified only Anderson's 2001 juvenile adjudication, and it mistakenly indicated that the adjudication was in Philadelphia rather than Montgomery County. According to Brown, if trial counsel had conducted a more thorough investigation, the discrepancies would have been discovered and accurate information regarding both adjudications could have been used to impeach Anderson, as they were crimen falsi crimes committed within the past ten years before trial and thus admissible under Pa.R.E. 609. Brown stresses that because of trial counsel's ineffectiveness, the jury did not have the benefit of the prior adjudications in assessing Anderson's overall credibility.
This claim lacks any arguable merit. This Court has summarized the relevant law in this area as follows:
"Counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary." Commonwealth v. Basemore , 560 Pa. 258, 744 A.2d 717, 735 (2000) (citing Strickland , 466 U.S. at 691, 104 S.Ct. 2052 ) (emphasis added); accord Wiggins [v. Smith ], 539 U.S. [510,] 521-23, 123 S.Ct. 2527 [156 L.Ed.2d 471] [2003] [ ] (analysis of ineffectiveness claim for failure to investigate must "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable "). Thus, counsel cannot be deemed ineffective for failing to investigate and introduce information he could not possibly have known about, so long as counsel's decision not to investigate was reasonable. See Commonwealth v. Sneed , 587 Pa. 318, 899 A.2d 1067, 1083 (2006) ("[C]ounsel cannot be deemed ineffective for not introducing information uniquely within the knowledge of the defendant and his family which is not supplied to counsel."); Commonwealth v. Malloy , 579 Pa. 425, 856 A.2d 767, 788 (2004) (counsel cannot be ineffective for failing to pursue particular mitigating evidence where counsel had no notice of *172 such evidence). However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Wiggins , 539 U.S. at 528, 123 S.Ct. 2527 (quoting Strickland , 466 U.S. at 690-91, 104 S.Ct. 2052 ).
Commonwealth v. Tedford , 598 Pa. 639, 960 A.2d 1, 39-40 (2008) (emphasis in original); see also Commonwealth v. Eichinger , 631 Pa. 138, 108 A.3d 821, 847 (2014) ("Counsel's strategic choices made after less than a complete investigation are considered reasonable, on a claim of ineffective assistance, precisely to the extent that reasonable professional judgments support limitations on the investigation. Failure to conduct a more intensive investigation, in the absence of any indication that such investigation would develop more than was already known, is simply not ineffectiveness.") (citation omitted).
No evidence of record suggests that trial counsel had any knowledge of the errors and omissions in Anderson's FBI excerpt, and they thus had no reasonable basis or obligation to obtain Anderson's juvenile records to verify the information that had been provided to them. As such, trial counsels' failure to conduct a more thorough investigation in this regard did not constitute ineffective assistance of counsel.
Moreover, even if we were to conclude that trial counsel should have conducted further investigation and uncovered the details with respect to the two crimen falsi crimes, we cannot say that Brown established any prejudice as a result of their failure to do so. On several occasions, this Court has held that the failure to impeach a witness with crimen falsi crimes is not per se prejudicial, so long as the record, taken as a whole, reflects that the witness was otherwise thoroughly cross-examined. See, e.g., Commonwealth v. Small , 602 Pa. 425, 980 A.2d 549, 565-66 (2009) ("Tucker's credibility was already assaulted to the nth degree - he was depicted as a crook, a recidivist, a drug abuser, a drunkard, and an admitted liar.... Consequently, we agree with the PCRA court that '[c]rimen falsi impeachment would have been merely cumulative and was unnecessary.' Essentially, Small was not prejudiced by counsel not cross-examining Tucker about crimen falsi as that information would have just reiterated a significant credibility attack that already occurred.") (citation omitted); Commonwealth v. Solano , 634 Pa. 218, 129 A.3d 1156, 1175 (2015) (finding appellant was not denied a fair trial and counsel did not act unreasonably in declining to question witness about a prior crimen falsi conviction where counsel impeached one of several eyewitnesses through other means).
c. The Commonwealth violated its Brady obligations
Brown next raises a brief and cursory Brady challenge, arguing that the Commonwealth failed to provide trial counsel with a complete report of Anderson's juvenile criminal history. Brown's Brief at 343. As discussed above, the FBI excerpt provided to trial counsel contained certain errors and omissions.
The United States Supreme Court in Brady established that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Commonwealth v. Reid , 627 Pa. 151, 99 A.3d 470, 496-97 (2014) (citing Brady , 373 U.S. at 87, 83 S.Ct. 1194 ). To succeed on a Brady claim, an individual must prove the following:
*173 (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression of the evidence prejudiced the defendant. Commonwealth v. Busanet, 618 Pa. 1, 54 A.3d 35, 48 (2012). To obtain a new trial based on the Commonwealth's failure to disclose evidence affecting a witness's credibility, a defendant must demonstrate that the reliability of the witness may be determinative of the defendant's guilt or innocence. Commonwealth v. Weiss, 604 Pa. 573, 986 A.2d 808, 815 (2000 [2009] ).
Id.
This Court has established that the prosecutorial duty under Brady respecting exculpatory evidence is limited to information in the possession of prosecutors or "in the files of police agencies[,] limited to those agencies of the same government bringing the prosecution." Commonwealth v. Watkins , 630 Pa. 652, 108 A.3d 692, 711-12 (2014). As a result, "Commonwealth prosecutors are not responsible to secure and disclose information held by federal authorities." Id. Here, the Commonwealth provided to trial counsel the information in its possession (the FBI excerpt), and had no obligation to investigate the accuracy of that information (as the FBI was not involved in bringing charges against Brown). We further agree with the PCRA court's observation that Brown "point[s] to no authority which states that the Commonwealth has to go above and beyond turning over a witness'[ ] FBI extract, or which states that the Commonwealth itself acted unreasonably in relying upon the information contained in that." Rule 907 Notice, 4/7/2016, at 24.
d. Counsel's failure to present Justin Akines-Harris as a witness
Next, Brown asserts that trial counsel should have presented another witness, Akines-Harris, to impeach Anderson's credibility. Of relevance to this argument, Anderson testified at trial that he was wearing a blue jacket when the shooting occurred and when police first stopped and frisked him. N.T., 5/26/2005, at 52. The morning of the shooting, Anderson claimed that he loaned a red jacket to a high school student named "Justice" or "Justin" who lived near him. Id. at 51-52. He did not know the boy's full name. Shortly after the shooting, Anderson claimed that he saw this boy again, the boy returned the red jacket to him, and Anderson put it on. Id. at 52-53. Anderson testified that as a result, when he went to a nearby restaurant, where the police approached him again, he was then wearing the red jacket. Id. at 53-54. While wearing the red jacket, the police put him in a patrol car and took him to the police station for questioning. Id. at 54.
Brown now claims that Justin Akines-Harris is the boy to whom Anderson claimed to have loaned his jacket, and that Akines-Harris would have testified that he never borrowed any jacket from Anderson. Brown's Brief at 31-32; PCRA Petition, Appendix, Akines-Harris Affidavit, 2/4/2013. This testimony, Brown asserts, would have undermined Anderson's explanation for changing his jacket, highlighting Anderson's guilt. Brown's Brief at 35-36. According to Brown, impeaching Anderson about changing his jacket would have significantly strengthened his defense, especially because trial counsel's strategy was to suggest that Anderson either killed Crawford or was protecting the person who killed Crawford. Id. at 36.
Brown waived this claim at trial. The trial court conducted the following colloquy with Brown:
The Court : Now, sir, are there any witnesses that you wanted to call or anything *174 that you discussed with [trial counsel] that is not going to happen at this trial? And I know that there's a few witnesses that are going to be called, and why don't we just state for the record who those are.
[Trial Counsel]: Judge, I intend to call Police Officer Kevin Fant, F-A-N-T, and Detective Gregory Rodden, R-O-D-D-E-N, who was the assigned detective in this case. And we may call the crime scene detective who did the crime scene, Detective David Baker and Detective George Fetters. Detective Fetters has not yet arrived. We've only interviewed Detective Baker.
The Court: Okay. So those are all the police witnesses. Were there any other names that you gave to [trial counsel] for the trial portion of this case, not the penalty phase, that you expected to testify and whose names just did not hear mentioned?
[Brown]: Negative.
The Court : All right. And are you satisfied with the representation that you have received from your counsel.
[Brown]: Yes.
N.T., 5/31/2005, at 14.
In Commonwealth v. Mallory , 596 Pa. 172, 941 A.2d 686 (2008), this Court held:
[A]n on-the-record colloquy is a useful procedural tool whenever the waiver of any significant right is at issue, constitutional or otherwise, e.g., waiver of a trial, waiver of the right to counsel, waiver of the right to call witnesses , waiver of the right to cross-examine witnesses, waiver of rules-based speedy trial time limits, etc.")
Id. at 697 (emphasis added). Similarly, in Commonwealth v. Paddy , 569 Pa. 47, 800 A.2d 294 (2002), we recognized that "a defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision. Id. at 316. To do otherwise, the Court held, "would allow a defendant to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict." Id. at 316. In Paddy , the defendant complained of trial counsel's ineffectiveness for failing to call alibi witnesses, in response to which we held that "this ineffectiveness claim fails for the fundamental reason that Paddy agreed at trial to counsel's decision not to call the witnesses in question." Id. at 315 ; see also Commonwealth v. Rios , 591 Pa. 583, 920 A.2d 790, 803 (2007), overruled on other grounds , Tharp , 101 A.3d 736.
As the record reflects, Brown participated in a colloquy at which he was advised of all of the witnesses his trial counsel intended to call in his defense, and he expressly acknowledged that after consulting with trial counsel, there were no other witnesses he wanted to testify on his behalf. As Brown voluntarily agreed that he did not want to call any other witnesses, he cannot now complain about trial counsel's failure to call Akines-Harris to testify.
III. Sutton's Testimony
Pretrial, the prosecutor and defense counsel agreed that Sutton would describe the shooter but would not identify anyone in the courtroom as that person. To wit:
[Commonwealth] : It is my understanding [that Sutton does] not believe [she]'d be able to identify by face. I'm willing to concede that [Sutton] will ... testify as to what [she] saw and heard and describe what [she] saw and heard but will not be asked to identify and would be so informed by me before [she takes] the stand.
*175 [Trial Counsel] : That's fine with me, Judge. That's exactly what my position was.
N.T., 5/25/2005, at 5-7 (emphasis added).
As reviewed hereinabove, during her testimony on direct examination, Sutton described some of the shooter's physical attributes, including that he was a male, approximately five feet seven to five feet nine inches tall, had a darker complexion than she did, and wore a white skully cap and black jeans. N.T., 5/27/2006, at 16, 31. Trial counsel objected when the prosecutor elicited this descriptive testimony from Sutton on the basis that it violated the pretrial agreement. Agreeing with the prosecutor's sidebar argument that "[c]omplexion, height, clothing, that's not an identification at all," N.T., 5/27/2006, at 28, the trial court overruled the objection. Id. at 28-29. In his summation, the prosecutor offered the following argument regarding Sutton's testimony:
But what did [Sutton] tell you? She tells you she's crossing the street with her friend Janell, "pop, pop, pop," however many there are; looks up; she sees the shooter wearing this jacket (indicating) - how come [trial counsel] forgot to tell you about that? - and wearing this sweatshirt - (indicating), which the defendant's wearing both of them.
She doesn't pay any more attention. She says, I didn't get a good enough look to identify his face. In fact, she says she's too busy with the victim that she doesn't even notice the chase that's going on behind her or across the street back that way.
* * *
But she tells you the shooter's darker-skinned than her. We all saw her. He's darker-skinned than her. She tells you later the police bring a man back. She says he's got the same complexion as the shooter. He's got the same build as the shooter. And the person she's referring to is him (indicating), the person the police brought back. But I don't know, A, because I didn't see the face as closely; but, B, because now I see a gray hoodie.
And lo and behold, what a coincidence: The police have opened up his black jacket by now to search him, remember, when they caught him. When she said "black jacket," she's talking about him. When she says "gray hoodie," she's talking about him.
That's funny. He keeps talking about Angela Sutton, but he only uses the word "white kufi." Angela Sutton, without pointing to a person in the courtroom, identifies him (indicating) as the killer. That's the simple, logical conclusion.
N.T., 5/31/2005, at 153-54 (emphasis added).
On direct appeal, appellate counsel pursued a claim that "the prosecutor committed reversible misconduct by eliciting testimony which was the functional equivalent of an identification - knowingly violating a pre-trial agreement that Angela Sutton would not be asked to provide an identification." Brown , 987 A.2d at 708. This Court roundly rejected this contention:
As the trial court aptly noted, an in-court identification is essentially witness testimony which points a condemning finger at the accused during trial. Trial Court Opinion, 4/4/08, at 12 (quoting Commonwealth v. Fowler, 466 Pa. 198, 352 A.2d 17, 20 (1976) ). During her testimony, Angela Sutton described the shooter's physical attributes and actions; she also stated she saw the man the police had in custody and noticed he was not wearing the same thing he had on when he shot the victim.
*176 Appellant's argument is that Ms. Sutton's descriptions constitute an identification because the jury had to be aware she was describing appellant. Indeed, the agreement specifically permitted descriptive testimony and prohibited identification testimony - that these two terms were distinguished in the agreement itself belies appellant's argument that Sutton's description constituted a de facto identification. Appellant cannot first agree to allow descriptive testimony and then object to unfavorable descriptions.
A true identification would have violated a pre-trial agreement that she would not be asked to identify him. However, Ms. Sutton did not identify the accused, but only described the scene as she observed it-which is precisely what was agreed to by both parties on the record. Ms. Sutton explicitly told the jury she did not see the shooter's face long enough to make an actual identification and was only describing her observations of the man in the back of the police car. N.T. Trial, 5/27/05, at 49-50. That the jury had previously heard what appellant was wearing when he was arrested is irrelevant; Ms. Sutton did not implicate appellant in the crime, and never once stated someone in the courtroom resembled the shooter . Rather, by relaying her observations, she simply confirmed what had previously been stated. Her testimony contained only such information as agreed to by both parties and therefore does not constitute an impermissible identification.
Even if such testimony had amounted to an impermissible identification, to obtain relief for alleged prosecutorial misconduct, (which is the framework in which this issue is cast), appellant must establish the prosecutor's conduct "had the unavoidable effect of prejudicing the jury ... as to render it incapable of fairly weighing the evidence and arriving at a just verdict." Commonwealth v. Carson, 590 Pa. 501, 913 A.2d 220, 236 (2006) (citations omitted). In this case, Ms. Sutton's confirmation of previous testimony was at most cumulative, as previous witnesses had described appellant's actions and appearance. The testimony was certainly not so prejudicial as to render the jury incapable of achieving a fair and just verdict. We therefore affirm the trial court's denial of appellant's request for a mistrial based upon alleged prosecutorial misconduct.
Brown , 987 A.2d at 708-09 (emphasis added).
In the present appeal, Brown now argues that the prosecutor committed prosecutorial misconduct, in violation of Brown's rights to due process, by breaching the pretrial agreement during the closing argument by saying, "Angela Sutton, without pointing to a person in the courtroom, identifies him [Brown] as the killer." Brown's Brief at 43. Brown insists that with this argument, the prosecutor "flatly asserted" that Sutton had identified Brown as the shooter. Id. As such, Brown posits that the prosecutor's argument was improper, as it was not based upon evidence of record or upon legitimate inferences drawn from evidence of record. Id. at 43-44 (citing Commonwealth v. Johnson , 635 Pa. 665, 139 A.3d 1257, 1275 (2016) ). Brown further claims that trial counsel was ineffective for failing to object to this portion of the prosecutor's closing argument, and that appellate counsel was ineffective for not pursuing the prosecutorial misconduct claim on appeal. Id. at 44-45.
"A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural *177 justice and that guilt is decided upon the basis of sufficient evidence." Pa.R.P.C. 3.8, Comment. This unique role in our justice system, however, does not prevent prosecutors from fairly responding to defense arguments with force and vigor, provided they are not injecting their own personal opinion. Commonwealth v. Burno , 626 Pa. 30, 94 A.3d 956, 974 (2014) ; Johnson , 139 A.3d at 1275. "A prosecutor enjoys reasonable latitude during closing arguments, and may advocate with force, vigor, and oratorical flair." Commonwealth v. Brown , 551 Pa. 465, 711 A.2d 444, 454 (1998). This latitude is not unrestrained, and closing argument "must be based upon matters in evidence, or upon the legitimate inferences that can be drawn from that evidence." Johnson , 139 A.3d at 1275 (citing Commonwealth v. Chester , 526 Pa. 578, 587 A.2d 1367, 1377 (1991) ). "Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict." Commonwealth v. Hutchinson , 611 Pa. 280, 25 A.3d 277, 307 (2011) (citation omitted).
For the same reasons that we offered on direct appeal with respect to Sutton's testimony, we likewise conclude that the prosecutor's summation did not constitute a violation of the pretrial agreement or otherwise constitute prosecutorial misconduct. The prosecutor's closing remarks were a summary of the descriptive testimony provided by Sutton and were grounded in the evidence of record. The prosecutor accurately informed the jury that Sutton did not see the shooter's face, and merely tied Sutton's description of the shooter to the other evidence adduced at trial. As the PCRA court correctly noted, the prosecutor's argument amounted to a contention that the person Sutton saw shoot Crawford could not have been anyone other than Brown. Rule 907 Notice, 4/7/2016, at 30. That is not an in-court identification. Moreover, it was a fair response to trial counsel's closing argument, in which he emphasized that Sutton, unlike other witnesses, said the shooter was wearing a "white kufi." N.T., 5/31/2006, at 100-01, 116, 121).
Because we conclude that the prosecutor's summation was not improper, we likewise reject Brown's contentions that trial and appellate counsel were ineffective for failing to object and/or pursue this claim on appeal.
IV. Affidavit of Joseph Hayes
In his fourth issue, Brown contends that the murder weapon could have been planted underneath the Jeep Cherokee, where police later uncovered it, and that trial counsel was ineffective for failing to explore this possibility. In support of his theory, Brown relies upon an affidavit he obtained from Joseph Hayes, the Jeep's owner. In the affidavit, Hayes indicated that he watched the police remove someone from under his vehicle and search the area for evidence. PCRA Petition, Appendix, Hayes Affidavit, 5/26/2011), ¶¶ 2-3. According to Hayes' affidavit, without finding anything, the police left the scene unsecured (with no police tape or a guard), at which time he moved the Jeep from the driveway to the front of his house so that he could look under it. Id. , ¶¶ 3-4. Finding nothing, he moved the Jeep back to the driveway, and about an hour later a police officer told him that they found a gun under the Jeep near the tailpipe. Id. , ¶ 5. According to Brown, Hayes' testimony, if presented at trial, would have revealed that the scene around the Jeep was not properly secured, that Hayes had moved his Jeep out of the driveway at a crucial time, and that the jury could have concluded *178 that someone placed the gun underneath the Jeep so that it could later be found. Brown's Brief at 50. Brown contends that trial counsel lacked a reasonable basis for failing to investigate this possibility, and that the absence of Hayes' testimony prejudiced him because it "would have cast doubt on the prosecution's theory that [Brown] hid the murder weapon in the undercarriage of the Jeep before he was pulled out by the police." Id.
The PCRA court granted an evidentiary hearing to receive and consider Hayes' testimony, but he failed to appear. Absent testimony from Hayes to support the contentions in his affidavit, the PCRA court properly concluded that Brown's claim lacked arguable merit and was not prejudicial. Based upon our review of the record, we discern no error in the PCRA court's conclusion. At trial, contrary to Hayes' affidavit, police witnesses testified that the scene around Hayes' Jeep was secure, without exception, from the time of Brown's arrest to the discovery of the gun underneath it. Rule 907 Notice, 4/7/2016, at 31; N.T., 5/26/2005, at 164-65; 211-12; 290-91; 293-94. Moreover, two police officers testified that when Brown was found under Hayes' vehicle, there was a red minivan parked directly behind the Jeep, blocking it in the driveway. N.T., 5/26/2005, at 172-73. As the PCRA court noted, Hayes' affidavit did not mention a red minivan, the existence of which (directly behind the Jeep) was confirmed by crime scene photographs. Rule 907 Notice, 4/7/2016, at 31-32 (citing N.T., 5/26/2005, at 172-73, 281-82). Accordingly, at best, Hayes' testimony at trial would have been contradicted by the testimony of multiple other witnesses and subjected to rigorous cross-examination. As a result, Brown has not established that this claim has arguable merit or that he suffered any prejudice.
V. Failure to retain an eyewitness identification expert
Brown next argues that trial counsel was ineffective for failing to hire an eyewitness identification expert. He submitted with his petition a report from an eyewitness identification expert, which he contends could have successfully been employed in dismantling the eyewitness testimony of, inter alia, Smith and Ellison. In support of this claim, Brown refers this Court to its decisions in Commonwealth v. Walker , 625 Pa. 450, 92 A.3d 766, 792-93 (2014), in which we held that "the admission of expert testimony regarding eyewitness identification is no longer per se impermissible in our Commonwealth," and Commonwealth v. Cousar , 638 Pa. 171, 154 A.3d 287, 307 n.11 (2017), in which we held that the testimony of an identification expert could be utilized on remand, even though the trial occurred before our decision in Walker . Id. at 792-93.
At the time of Brown's trial in 2006, eyewitness identification testimony was inadmissible in this Commonwealth. See, e.g. , Commonwealth v. Spence , 534 Pa. 233, 627 A.2d 1176, 1182 (1993). As this Court has recognized, it is not ineffective assistance of counsel to fail to predict (and hence comply with) future changes in governing law. Commonwealth v. Mason , 634 Pa. 359, 130 A.3d 601, 650 (2017). Our decision in Cousar did not signal any different understanding in this regard, as in that case we held only that because the case was being remanded for further proceedings on other grounds (ineffective assistance of counsel for failing to cross-examine based upon a prior inconsistent statement), counsel could, if appropriate, offer eyewitness identification evidence during the remand proceedings. Cousar , 154 A.3d at 307 n.11.
*179 Remaining Penalty Phase Issues
VII. Brown was denied a "reliable sentencing"
In his first penalty-phase claim, Brown raises three related arguments intended to establish that he was denied a "reliable sentencing." First, he argues that the jury was influenced by facts not of record when a juror informed the jury that Brown would serve his sentence in segregation rather than in the prison's general population. Second, Brown contends that the Commonwealth impermissibly argued to the jury that age can be an aggravating factor. Third, Brown insists that the prosecutor wrongly argued to the jury that the mitigating factors that Brown's counsel argued to the jury were in fact mere excuses for his conduct.
a. Juror influence
Brown first argues that one of the jurors, Stephen Grillo ("Grillo"), tainted the jury deliberations. According to an affidavit Brown obtained from Grillo, some of the other jurors asked during deliberations, "what was the point of voting for death since [Brown] was just going to sit in jail for [twenty] years." PCRA Petition, Appendix, Grillo Affidavit, 4/24/2013, ¶ 5. Grillo's affidavit indicated that he told the other jurors that, if sentenced to death, Brown would "at least be in segregation and not in general population." Id. According to Grillo, he acquired this knowledge by reading John Grisham novels. Id.
The law in this area is clear: "A juror may not impeach his or her own verdict after the jury has been discharged. An exception to this rule is made for those situations where a jury has been exposed to an ex parte influence, which possesses a reasonable likelihood of prejudice." Commonwealth v. Rollins , 558 Pa. 532, 738 A.2d 435, 451 (1999) (quoting Commonwealth v. Laird , 555 Pa. 629, 726 A.2d 346, 356 (1999) ). In Rollins , the appellant argued that one juror improperly informed other jurors during deliberations that if it they sentenced the appellant to life imprisonment rather than death, he would be eligible for parole after serving only thirteen years of incarceration. Rollins , 738 A.2d at 451. Our Court rejected this argument, determining that where no outside factor influenced the jury, deliberations were not tainted. Similarly here, Grillo, as a member of the jury, indicates that he made the statement at issue himself -- and thus there was no outside ex parte influence on the jury. Grillo cannot, by affidavit, impeach his own verdict. As such, this claim lacks arguable merit.
b. Non-statutory aggravating factors
Brown next protests the Commonwealth's alleged presentation of non-statutory aggravating circumstances to the jury. At the penalty phase of the trial, Brown's counsel asserted that his age at the time of the shooting (twenty-five) was a mitigating factor in his favor. 42 Pa.C.S. § 9711(e)(4). In closing arguments, the prosecutor responded as follows:
Let's look at the first one: The age of the defendant at the time of the crime they're putting forth as a mitigating factor. When I first heard they were putting forth, I said, What? I can understand that if he was, you know, 18 or 17 or 19 ... When you're 25, you're a man. You can't come before a jury and say, I'm only 25. If anything, it works the opposite way. You're 25. You're more than old enough to make responsible choices for yourself. You're more than old enough to know that shooting Robert Crawford four times is not a choice you're allowed to make. Now I don't see any way in which the evidence shows that his age of 25 at the time of the *180 murder could possibly mitigate this crime. If anything, it aggravates it.
N.T., 6/2/2017, at 66-67 (emphasis added). The trial judge immediately interjected and instructed the jury to disregard the prosecutor's personal opinion, stating that "the prosecutor's not allowed to tell you ... what his personal views are. So nobody cares that he doesn't see how this could possibly affect anything one way or the other." Id. at 67. Brown attacks trial counsel for not objecting and/or requesting a curative instruction. While acknowledging that the judge admonished the prosecutor, he argues that trial counsel should have asked the judge to specifically instruct the jurors that age is not a statutory aggravator. Pointing out that the jury did not find his age to be a mitigating factor, Brown claims he was prejudiced. Brown's Brief at 54.
Brown is correct that the prosecutor's remark constituted an impermissible personal opinion, and that age is not an aggravating circumstance under the law. 42 Pa.C.S. § 9711(d). Nevertheless, we agree with the PCRA court's determination that Brown was not prejudiced by trial counsel's failure to seek an immediate instruction to the jury on the relevant law. As indicated, the trial court promptly recognized the prosecutor's error, even before trial counsel could lodge an objection, and immediately instructed the jury to disregard what the prosecutor had just stated. N.T., 6/2/2005, at 67. Moreover, at the outset of the penalty phase, the trial court thoroughly explained to the jurors their responsibilities with respect to finding aggravating and mitigating factors and reviewed for them of all of the possible statutory aggravating and mitigating factors upon which they could base their decision. N.T., 6/1/2005, at 35-36. During closing arguments, trial counsel and the prosecutor both summarized the mitigating and aggravating circumstances they each believed the jury should find. Finally, the trial court's charge to the jury included an exhaustive review of the possible mitigating and aggravating being presented for consideration by both parties. N.T., 6/2/2005, at 108-112. For these reasons, we discern no basis for concluding that Brown was prejudiced by trial counsel's failure to request an instruction on age as an aggravating circumstance immediately after the prosecutor's improper remark during closing argument, as no basis exists to conclude that there was any jury confusion on this issue.
c. Mitigating circumstances as excuses
Third, Brown argues that the prosecutor improperly disregarded the evidence presented by the defense in support of mitigating circumstances as mere "excuses" for Brown's behavior in killing Crawford. This claim is based upon the following excerpt from the prosecutor's closing argument in the penalty phase of the trial:
What the defense is going to ask you to do -- as I understood the testimony they put on for the last day and a half -- is asking you to use his early childhood to excuse . Well, they don't want this sob story, however true a lot of it is, they don't want to actually reflect on his -- his character as it was at 25. They want to use it to excuse his bad character. They want you to say, Sure, you made those horrible choices and killed Robert Crawford; please excuse it because of what happened.
Ms. Rubino: Objection.
The Court: Sustained.
N.T., 6/2/2005, at 80 (emphasis added).
Brown insists that these arguments clouded the jury's understanding of mitigating and aggravating circumstances, and *181 that in addition to objecting to them, his counsel should also have requested a curative instruction advising the jury that mitigating circumstances are not excuses. Brown claims that appellate counsel could not have possessed a strategic basis for her omission, and that but for the prosecutor's improper argument and his counsel's failure to request a curative instruction, "there is a reasonable probability that at least one juror would have found (e)(8) mitigation and concluded that this mitigation outweighs the aggravating evidence presented."[19] Brown's Brief at 55.
In support of this claim, Brown argues that in Eddings v. Oklahoma , 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), "the Supreme Court declared mitigating evidence cannot be disregarded as an 'excuse.' " Brown's Brief at 55. Brown's reliance upon Eddings is misplaced. In that case, a trial judge presiding over a bench trial cast aside, as a matter of law, all of the mitigating evidence presented by the appellant on the grounds that it was improper to consider mitigating evidence. Eddings , 455 U.S. at 108-09, 102 S.Ct. 869. The intermediate appellate court affirmed, reasoning that the evidence of the appellant's family history did not "excuse" his behavior. Id. The United States Supreme Court reversed, holding that evidence of the appellant's violent upbringing was relevant mitigating evidence that should have been considered. Id. at 114-15, 102 S.Ct. 869. The high Court remanded with instructions for the lower court to consider and weigh it. Id. at 117, 102 S.Ct. 869. In this case, in substantial contrast to Eddings , the jury was not precluded from hearing any mitigating evidence relating to Brown's childhood or family history.
We agree with the Chief Justice that the prosecutor's remarks were plainly improper. Mitigating evidence is not in the nature of "excuses" for the crime committed. Nevertheless, under the circumstances presented here, counsel's failure to request a curative instruction for the prosecutor's clear impropriety during closing argument does not constitute a basis for PCRA relief, as Brown cannot demonstrate that he suffered prejudice. Immediately after closing arguments, the trial court charged the jurors on mitigating circumstances in full detail, explaining every mitigator they should consider and how each of the mitigators should be considered. N.T., 6/2/2005, at 104-22. Further, directly contrary to the prosecutor's contention that mitigating factors are excuses, the trial court emphasized to the jury, both at the outset of the penalty phase of the trial and again in her charge, the importance of mitigating factors, describing them as "one of the law's safeguards against unjust death sentences." Id. at 120. Given the trial judge's precise and thorough instructions, no grounds exist on which to conclude that the jury did not understand its clear obligations in the penalty phase of the trial, including with respect to mitigating factors. Brown has not demonstrated that a curative instruction during the prosecutor's closing argument would have resulted in a different outcome in the penalty phase of the trial, and thus no relief is due on this claim.
VIII. Brown's prior homicide conviction
Brown contends that he was denied due process, a reliable sentencing, and effective assistance of counsel because the Commonwealth impermissibly introduced *182 evidence of a constitutionally infirm prior homicide conviction as an aggravating circumstance. Pursuant to 42 Pa.C.S. § 9711(d)(11), it is an aggravating circumstance to have "been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." 42 Pa.C.S. § 9711(d)(11). In this regard, during the penalty phase of the trial, the Commonwealth presented the testimony of Philadelphia Assistant District Attorney William Fisher ("Attorney Fisher"), who prosecuted Brown in 2004 for the murder of a Rite Aid store manager. Attorney Fisher testified that while Brown did not pull the trigger in that incident, he conspired with his codefendants to rob the Rite-Aid and was accordingly convicted of second-degree murder.
Brown concedes that his prior conviction has thus far been affirmed at all levels of appellate review,[20] and points only to his remaining available challenges to that conviction in the federal courts. In his brief, Brown indicates that he asserts this claim now only "to preserve it in the event his second-degree murder conviction is vacated in federal proceedings." Brown's Brief at 76. As such, no basis exists for granting relief as to this claim.
IX. Fisher's testimony in the trial of the prior homicide
Brown next contends that Attorney Fisher's testimony violated his constitutional rights, and argues that his trial and appellate counsel were ineffective for failing to raise the issue. Brown's Brief at 77. The testimony at issue was as follows:
[Commonwealth]: Can you tell the jury a little bit about the facts that came out during the trial?
[Attorney Fisher]: Absolutely. The murder occurred on January the 19th, 2003, somewhere between 6:00 and 6:30 p.m. The plan was actually hatched at the house of Jamaar and James Richardson, which was about a block away from the Rite Aid store. The Rite Aid store was located at 12th and Girard. The planning took place about an hour or so, maybe a little bit more than that, before the robbery. Involved with the planning was Jamaar, James; a fellow by the name of Ronald Vann was there; Kiana Lyons to a lesser extent - it's a young woman by a, a young woman; I guess she was about 17, 16, 17 at the time - Chris Kennedy; and [Brown] (indicating). Jamaar Richardson provided basic information about the Rite Aid store. He worked there. He was hired several months prior to the murder. He was hired by Michael Richardson, as a matter of fact, prior to the murder.
* * *
[Brown], however, assigned the tasks and made the general outline or plan for the robbery.... [T]he general plan was that they'd go up to the store; they would go inside the store; take whatever hostages were inside the store; lock the store; keep anybody from leaving or calling the police. And then, specifically, Lavar told James Kennedy that he was *183 the one to deal with the manager. And they'd ask him specifically at that time of the planning, did he know what the manager looked like. [Brown] told ... Chris Kennedy to shoot [the store manager] in the leg to loosen him up so that he'd open the safe .... [An] hour later they walk up to the store ... as a very loose group. Plan goes somewhat awry at this point. Chris Kennedy goes into the store first. Now, [Brown] ... James Richardson, and ... Ronald Vann are supposed to come in later and take care of the door, watch the hostages, keep them inside, keep them in control. Before they can get into the store, Kennedy found Michael Richardson, boom, shoots him in the leg. After the shot's fired, everybody exits the store. I mean, they run out: The security guard, everyone runs out of the store with the exception, of course, of Michael Richardson and Chris Kennedy.
[Brown] (indicating), Mr. Vann, and ... James Richardson, they leave. They leave. Meanwhile, inside the store, after Kennedy shoots ... Michael Richardson in the leg, his leg -- it has a compound fracture on it; he can't walk; he drags him to the safe, to the area where the safe is. Mr. Richardson opens up the safe. They take the money out of the safe. It's put in a bag. Kennedy then sticks the gun into ... Michael Richardson's ear and ... kills him, pulls the trigger. Kennedy is caught on the scene. There is an investigation that goes on for a while. And I ... don't recall ... how long it went on.
N.T., 6/1/2005, at 64-68 (emphasis added).
Brown contends that trial counsel should have challenged Attorney Fisher's testimony on two grounds. First, he argues that it was error to allow the Commonwealth, merely for the purpose of establishing an aggravating circumstance, to admit inflammatory and prejudicial testimony detailing the underlying facts of the other murder conviction. Brown's Brief at 79. He asserts that it violated his constitutional rights to due process and to confront and cross-examine witnesses. Second, he claims that trial counsel failed to object to inaccuracies in Fisher's testimony. Id. at 79-80.
With respect to the constitutional arguments, they are entirely undeveloped. Brown claims that the United States Supreme Court addressed the same issue he raises here in Old Chief v. United States , 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). While it is true that the Supreme Court in Old Chief held that a federal district court erred in admitting detailed testimony regarding a prior crime that formed the predicate for a subsequent weapons violation, id. at 190-91, 117 S.Ct. 644, it did so based upon its analysis of the requirements of Rule 403 of the Federal Rules of Evidence. Id. It did not conduct any constitutional analysis or base its decision on the violation of any constitutional rights. Id. Notably, on direct appeal in this case, this Court took precisely the opposite view on the admissibility of Attorney Fisher's testimony, based upon our analysis of Pennsylvania law. Brown , 987 A.2d at 711. In concluding that the Commonwealth properly introduced the facts underlying Brown's prior second-degree murder conviction, the Court relied upon the following reasoning from Rios :
[A] capital sentencing hearing is not a sanitized proceeding limited only to evidence of aggravating circumstances. Rather, it must, by necessity, inform the jury of the history and natural development of the events and offenses with which the appellant is charged, as well as those which he has been convicted, so that the jury may truly understand the nature of the offenses and Appellant's character. The jury simply cannot perform *184 its function in ignorance of the facts of the crime for which Appellant is being sentenced, or the crimes for which he has previously been convicted, to the extent that those crimes may properly support the existence of aggravating circumstances provided in Section 9711(d).
Brown , 987 A.2d at 711 (quoting Rios , 920 A.2d at 814-15 ) (emphasis omitted).
The remainder of Brown's constitutional claim in this regard is even less developed, as he merely refers to Fisher's testimony as hearsay and cites to two Supreme Court decisions dealing (generally) with federal constitutional rights to due process and to confront witnesses. Brown's Brief at 79. As he offers no explanation, legal analysis or argument, these claims are waived. See, e.g., Commonwealth v. LaCava , 542 Pa. 160, 666 A.2d 221, 235 (1995).
With respect to his argument regarding trial counsel's lack of objection to inaccuracies in Fisher's testimony, Brown asserts that his trial counsel "failed to correct false testimony from Attorney Fisher, who told the jury that there was evidence at [Brown's] 2004 homicide trial that Brown told his codefendant in that case to shoot the victim in the leg." Brown's Brief at 80. The PCRA court properly rejected this argument because the record from the 2004 jury trial supported Attorney Fisher's testimony. Specifically, the PCRA court recounted the 2004 trial testimony of Commonwealth witness Kiana Lyons, who testified that "prior to the robbery and murder, she heard [Brown] and his cohorts giving out orders. [T]hey ordered Christopher Kennedy to go in and give the cashier a " 'leg shot.' " Rule 907 Notice, 4/7/2016, at 56 (citing Commonwealth Exhibit E; N.T., 7/19/2004, at 113-14). Additionally, the PCRA court reasoned that Detective David Baker read Lyons' police statement at the 2004 jury trial, in which Lyons informed the police that Brown "was the one giving out orders of who was to do what." Id. (citing Commonwealth Exhibit E, N.T. 7/26/2004, at 63). The PCRA court determined that the 2004 record supported Attorney Fisher's testimony; therefore, trial counsel had no reason to object, and appellate counsel had nothing to challenge on direct appeal.
The PCRA court's determination is supported by the record and is free of legal error. Because trial counsel could not have been ineffective for failing to raise a meritless claim, Commonwealth v. Wright , 599 Pa. 270, 961 A.2d 119, 149 (2008), no relief is due.
X. Simmons instruction.
Brown next claims that his trial counsel was ineffective for failing to request a jury instruction in accordance with Simmons v. South Carolina , 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In Simmons, the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Id. at 156, 114 S.Ct. 2187. Due process requires that an individual be sentenced by a jury exercising discretion between the statutorily prescribed options of life without possibility of parole and death. See, e.g. , Commonwealth v. Dougherty , 580 Pa. 183, 860 A.2d 31, 37 (2004). Where future dangerousness is placed at issue, the failure to provide a "life means life" instruction deprives the jury of accurate sentencing information, thus violating the Eighth Amendment requirement that a capital sentencing jury be permitted to consider and give effect to all relevant mitigating circumstances. Id. In Pennsylvania, a Simmons instruction informing the jury that life imprisonment means life without the *185 possibility of parole is mandated only when: (1) the prosecutor makes the defendant's future dangerousness an issue; and (2) the defendant specifically requests that a "life means life" instruction be provided. Id.
Brown points to two locations in the record where he contends that his future dangerousness was placed at issue, thus requiring counsel to request a Simmons instruction.[21] Brown's Brief at 85-86. After reviewing these contentions, we disagree in both instances.[22]
First, Brown argues that his own trial counsel implicated his future dangerousness by "eliciting from its own expert witness, Dr. Tepper, that it was 'very difficult to predict' whether [Brown] presented a future danger.' " Brown's Brief at 85.
[Trial Counsel]: From your review of the records, do you feel that [Brown] would be able to co-exist in a prison setting with other inmates and with staff in the future without lashing out in a violent way.
[Dr. Tepper] : Well, again, very difficult to predict. I have been able to review some more recent what we call institutional records, and there's no indication of any severe behavioral or disciplinary difficulties. I ... cannot really predict that. Mr. Brown understands rules. He understands, especially in a jail setting, the need to abide by rules. At least at this point there's been no records provided to me indicating that he's had those kind of disciplinary problems.
N.T., 6/1/2005, at 232-33 (emphasis added).
This testimony did not establish the need for a Simmons instruction, for two reasons. First, Dougherty and subsequent cases make clear that a Simmons instruction is required only where the Commonwealth places the defendant's future dangerousness at issue. See, e.g. , Dougherty , 860 A.2d at 37. Here, Brown's trial counsel, rather than the Commonwealth, asked the question that elicited Dr. Tepper's response implicating future dangerousness. Second, even if this ineffectiveness claim had arguable merit, the lack of a Simmons instruction did not result in prejudice to Brown. The purpose of a "life means life" charge is to insure that the jury understands that regardless of whether it sentences the defendant to life without parole or to death, the defendant will never again *186 be a danger to the general public. Simmons , 512 U.S. at 163, 114 S.Ct. 2187. During both her opening and closing arguments to the jury during the penalty phase of the trial, and as part of a clear strategy to convince the jury to sentence Brown to life without parole rather than to death, Brown's counsel explained that Brown would never be eligible for parole and would never again be a danger to the public:
[W]e'll also tell you during the course of this that life in prison in Pennsylvania is life in prison. It's not [twenty-five] years like some people think. There is no parole for mandatory life sentence. So it's not like, by giving him a life sentence, you're going to send him home.
* * *
[Brown will] never see the light of day again outside of the prison walls, no matter what your penalty verdict, because he's already serving a life sentence for the other killing. So what we ask of you is to just let him stay where he is, where he does not present any danger to the public...
N.T., 6/1/2005, at 44-45; N.T., 6/2/2005, at 102. As a result, no basis exists upon which to conclude that the jury did not understand that "life means life," or, as a result, that there was any reasonable probability that a formal Simmons instruction from the trial court could have resulted in a different outcome. See generally Commonwealth v. Arrington , 624 Pa. 506, 86 A.3d 831, 856 (2014) (finding that the absence of a Simmons instruction did not violate appellant's due process rights "[i]n light of [his] counsel's lengthy explanation of the meaning of a life sentence, which clearly conveyed that [a]ppellant would be ineligible for parole under Pennsylvania law").
Next, Brown argues that a Simmons charge was required based upon the following portion of the prosecutor's summation to the jury:
If we want to know something about his character, we can learn everything we need to know by examining what he did as an adult from the first murder to the second murder. At the age of [twenty-four] he participated in a violent robbery that ended up being a murder and leaving Michael Richardson shot twice and dead in that Rite Aid. Now, there's a lot of ways that could have affected him because, remember, he didn't get caught. He didn't get arrested until he got chased down by Officer Davis and Brown and SEPTA Officer Fant. So from January of [2003] until December of [2003], when he got arrested in this case, he had essentially had the opportunity to think that he got away with that murder. Chris Kennedy was caught at the scene for shooting him, but he hadn't been arrested at all.
* * *
He was in a situation when he could have made a whole bunch of choices. A lot of people would have thought, Oh, my God, the robbery went wrong. The manager is dead. This is horrible. Maybe I need to - to stay away from these guys. Maybe I need to turn my life around. Maybe I need to stop carrying a gun around. Maybe I need to stop planning crimes. Maybe ... this is a lesson for me to improve my character, to finally implement those lessons as I progressed as a teenager and put them in play into my life because I got ... a child out there that I need to support. He could have made that decision. A person with better character would have made that decision.
But we know what he did: He shot a man down in daylight in front of all those school kids. Apparently, the evidence tells us what he learned from it, *187 his character learned from it, was he was king of the streets. He was bulletproof. He could do whatever he wanted to whomever he wanted. He had the power of life and death over anyone he wanted, including Robert Crawford. That's what we know about his character.
N.T., 6/2/2005, at 80-83.
Brown insists that this closing argument highlighted that he is a future danger, as he carries guns, plans crimes, and thinks he holds the power of life and death in his hands. Brown's Brief at 85. The PCRA court disagreed, finding that the prosecutor's argument focused on Brown's past, rather than his future, dangerousness. The legal analysis of the PCRA court is sound. In Commonwealth v. Chmiel , 585 Pa. 547, 889 A.2d 501 (2005), this Court rejected a defendant's claim on direct appeal that the trial court erred in failing to include a Simmons instruction in the charge to the jury. We held that the prosecutor's arguments in support of finding aggravating circumstances implicated only the appellant's past violent convictions and conduct, and thus did "not implicate the issue of his or her future dangerousness."[23] Id. at 538.
The prosecutor's closing argument focused on Brown's prior actions, including his role in the death of Michael Richardson in the Rite Aid robbery and his shooting of Crawford. As such, as in Chmiel , the prosecutor limited his arguments to Brown's past violent convictions and conduct, and accordingly did not place his future dangerousness at issue. No relief is due on this claim.
XI. Lack of Remorse
Brown next directs us to the prosecutor's direct examination of Brown's Grandfather:
[Commonwealth]: Has your grandson ever expressed remorse for his role in planning or carrying out the robbery that led to the death of Michael Richardson in that Rite Aid?
[Grandfather]: What my grandson always told me from the first day, he was not there.
*188 [Commonwealth]: Okay. So rather than express remorse, what you know from Mr. Brown, your grandson, is that he had nothing to do with it?
[Grandfather]: That's what he told me.
[Commonwealth]: Okay. The verdict of the jury notwithstanding, you know --
[Trial Counsel]: Objection, Judge.
The Court: Sustained.
[Commonwealth]: Okay. Well, again in terms of being a good example, is your grandson --
[Trial Counsel]: Objection. I believe he said "example of his pitfalls."
[Commonwealth]: Okay.
The Court: Overruled. I'll hear the question first[.]
[Commonwealth]: Again, in terms of being a good example, has your [grand]son ever expressed remorse to you of the personal pitfall of having killed [Robert] Crawford, the victim in this case?
The Court: I'm not going to allow it.
[Trial Counsel] : Objection.
N.T., 6/1/2005, at 198-99.
Brown maintains that his appellate counsel was ineffective for failing to pursue a claim that the prosecutor's references to lack of remorse amounted to an "improper comment on [Brown's] constitutional right not to testify." Brown's Brief at 90. Citing to Griffin v. California , 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), Brown argues that it was impermissible for the prosecution to argue for any negative inferences in relation to a defendant's right to remain silent. Brown's Brief at 90. Similarly, Brown relies upon Lesko v. Lehman , 925 F.2d 1527 (3d Cir. 1991), cert. denied , Lehman v. Lesko , 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991), for the proposition that a prosecutor's reference to a defendant's alleged lack of remorse constitutes "an improper condemnation" of his invocation of his constitutional right to remain silent. Brown's Brief at 90-91.
This claim lacks merit, as neither Griffin nor Lesko have any application here. Beginning with Griffin , in that capital case, the defendant testified in the guilt phase of his trial. In the summation to the jury, the prosecutor expressly criticized the defendant for not testifying that he was sorry for his actions, arguing that an inference of guilt could be deduced from the defendant's silence:
The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her.
What kind of a man is it that would want to have sex with a woman that beat up is [sic] she was beat up at the time he left?
He would know that. He would know how she got down the alley. He would know how the blood got on the bottom of the concrete steps. He would know how long he was with her in that box. He would know how her wig got off. He would know whether he beat her or mistreated her. He would know whether he walked away from that place cool as a cucumber when he saw Mr. Villasenor because he was conscious of his own guilt and wanted to get away from that damaged or injured woman.
These things [defendant] has not seen fit to take the stand and deny or explain.
And in the whole world, if anybody would know, this defendant would know.
Essie Mae is dead, she can't tell you her side of the story. The defendant won't.
Griffin , 380 U.S. at 610-11, 85 S.Ct. 1229. In the charge to the jury, the trial judge then advised the jury that the defendant *189 had a constitutional right not to testify, but then added:
As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable.
Id. at 610, 85 S.Ct. 1229. The United States Supreme Court reversed, holding that "the Fifth Amendment, in its direct application to the federal government and in its bearing on the states by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id. at 615, 85 S.Ct. 1229.
The lack of parallels between Griffin and the present case are clear. Brown did not testify. The prosecutor, while implying Brown's lack of remorse, made no reference to his failure to testify and at no time suggested to the jury that Brown's failure to testify could be considered as evidence of his guilt. The trial court here did not instruct the jury that it could deem Brown's failure to testify (or to deny or explain any evidence against him) to be evidence of guilt. Entirely to the contrary, the trial court here sustained trial counsel's objections to all questions relating to whether Brown had expressed remorse with respect to the death of Crawford, and charged the jury that Brown had "the right to remain silent," that jurors "must not hold it against [him]," and that they could not draw any "inference adverse to the defendant" for his failure to testify." N.T., 5/26/2005, at 11; 5/31/2005, at 176. For these reasons, Griffin provides no basis for relief to Brown.
In Lesko , the defendant took the witness stand during the guilt phase of his capital trial and provided mitigating testimony. During summation, the prosecutor argued:
And I want you to consider that John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry.
Lesko , 925 F.2d at 1540. On habeas review following this Court's affirmance of the denial of post-conviction collateral relief, the United States Court of Appeals for the Third Circuit concluded that the above-quoted argument by the prosecutor "constituted a comment on his assertion of his fifth amendment privilege against self-incrimination, in violation of the rule of Griffin ... forbidding such comment." Id. The federal appeals court ruled that "a capital defendant does not completely waive his Griffin rights by testifying at the penalty phase solely on mitigating factors that are wholly collateral to the merits of the charges against him." Id. at 1541-42. According to the court, the remark, "[f]airly construed[,] ... was a condemnation of Lesko's failure to testify about his role in the events surrounding the ... homicide. Clearly, such testimony would have been self-incriminating" and would have contradicted his defense theory presented throughout the trial. Id. at 1544. As such, "the prosecutor's criticism of [defendant]'s failure to express remorse penalized the assertion of his Fifth Amendment privilege against self-incrimination, in violation of the rule in Griffin v. California ." Id. at 1545.
*190 In rejecting Brown's claim in this case, the PCRA court found Lesko to be factually distinguishable, stating as follows:
Unlike Lesko , the prosecutor's questioning of [Brown's] grandfather was not a comment on [Brown's] failure to testify regarding his remorse. The Commonwealth did not suggest that the jury should draw a negative inference from [Brown's] failure to testify and apologize, and in no way mentioned the witness stand.
Rule 907 Notice, 4/7/2016, at 61.
Moreover, and more importantly, the federal appeals court's decision in Lesko is not binding on this Court and does not reflect the law of this Commonwealth. In Commonwealth v. Clark , 551 Pa. 258, 710 A.2d 31, 39 (1998), abrogated on other grounds , Commonwealth v. Freeman , 573 Pa. 532, 827 A.2d 385, 400 (2003), this Court expressly rejected Lesko 's rationale. In Clark , the defendant testified during the penalty phase of his trial, offering mitigating evidence regarding his background and character. In the closing argument, the prosecutor stated that "[n]ot once did Mr. Clark show any remorse here." Clark , 710 A.2d at 40. In rejecting Lesko and finding no violation of Griffin, we reasoned as follows:
Given the context in which these comments were made we find no violation of the rule in Griffin . The comments were not clearly intended to create in the minds of the jury an adverse inference from the defendant's failure to testify as to the substance of the underlying charges; the comments were a reference to the demeanor of the witness and the testimony he presented as to his character. As we reject the rationale of Lesko , and find no violation of the Griffin rule, we also conclude that trial counsel was not ineffective in failing to object to this comment by the prosecutor in the closing argument at penalty phase.
Id.
Subsequent to our decision in Clark, this Court has consistently held that the Commonwealth may argue during the penalty phase of a capital case that a defendant showed no remorse "so long as it is not an extensive tirade." Commonwealth v. Rivera , 565 Pa. 289, 773 A.2d 131, 141 (2001) ; see also Commonwealth v. Bryant , 620 Pa. 218, 67 A.3d 716 (2013) ("The trial court concluded that because the prosecutor's comments were not lengthy or extensive and [a]ppellant had indeed shown no remorse during the penalty phase, the challenged comments did not warrant the grant of a mistrial, i.e., they did not deprive [a]ppellant of a fair and impartial trial."). A prosecutor's remarks about a defendant's lack of remorse do "not inappropriately implicate [the] constitutional right to remain silent," so long as they "in no way [infer or imply] that [a]ppellant had a duty to testify." Commonwealth v. Fletcher , 580 Pa. 403, 861 A.2d 898, 918 (2004) ; see also Commonwealth v. Chester , 526 Pa. 578, 587 A.2d 1367, 1378 (1991) ("From their conduct and conversation with each other and among acquaintances, an inference could fairly be drawn that appellants were not remorseful, a factor that legitimately could be weighed by the jury in assessing the presence of any mitigating factors."), vacated on other grounds , Chester v. Horn , 2011 WL 710470, at *3 (E.D. Pa. Feb. 28, 2011).
XII. Cumulative effect of counsel's alleged errors
Brown argues that even if this Court does not find that Brown was prejudiced by any single error committed by his trial and appellate counsel, the errors collectively prejudiced him. This Court has held that "no number of failed claims may collectively *191 warrant relief it they fail to do so individually." Commonwealth v. Rainey , 593 Pa. 67, 928 A.2d 215, 245 (2007). Conversely, we have also recognized that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." Commonwealth v. Johnson , 600 Pa. 329, 966 A.2d 523, 532 (2009). For there to be cumulation, however, there must be errors with significant prejudicial effect. As reflected hereinabove, we have identified no such errors. Brown's claims do not establish prejudice warranting PCRA relief, either individually or in the aggregate.
XIII. Denial of evidentiary hearing
For his thirteenth and final issue, Brown argues that the PCRA court erred in (1) denying multiple discovery requests during the pendency of his PCRA petition, and (2) dismissing his PCRA petition without affording him a full evidentiary hearing.
With respect to the first claim, Brown contends that the PCRA court denied him full, fair and reliable PCRA review by denying multiple discovery requests made by his counsel for potentially exculpatory evidence. In several discovery requests, Brown sought access to the handgun found under the vehicle where he was hiding, his clothing at the time of his arrest, the identity of the detective who found the gun, and any and all reports from police/detectives whom crime scene technicians recorded as being present at the scene, but from whom Brown's attorneys did not receive reports concerning the scene.
In its Rule 1925(a) opinion, the PCRA court reviewed the relevant law with respect to discovery requests in connection with PCRA proceedings. See Pa.R.Crim.P. 902(E)(2) ("On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause."). This review included a discussion of this Court's decision in Commonwealth v. Carson , 590 Pa. 501, 913 A.2d 220 (2006), in which we affirmed a PCRA court's decision to reject a discovery request for "all ballistic reports and evidence for ballistic testing." Id. at 260. In Carson , we rejected the petitioner's contention that he had a right to challenge the Commonwealth's position that the gun recovered from the petitioner could be linked to the crime, as the petitioner had not demonstrated that "the ballistics results were erroneous." Id. at 261. In so ruling, we noted that in the absence of any reason to believe that the ballistics results were inaccurate, the discovery requests lacked good cause and were instead "nothing more than a fishing expedition for possible exculpatory evidence." Id. ; see also Commonwealth v. Cox , 603 Pa. 223, 983 A.2d 666, 692 (2009) ("The PCRA court did not abuse its discretion here because [a]ppellant failed to present an adequate reason why he was entitled to test the ballistic evidence. The assertion that independent testing might result in the discovery of exculpatory evidence is not a sufficient reason to overturn the decision of the PCRA court."); Hanible , 30 A.3d at 484 ("We agree with the Commonwealth that [a]ppellant has failed to demonstrate that the PCRA court abused its discretion by denying his request for additional discovery relating to ballistics reports that may or may not exist. Appellant has failed to make any showing of good cause why this information, if it existed, would have been exculpatory to him."); Commonwealth v. Abu-Jamal , 553 Pa. 485, 720 A.2d 79, 90-91 (1998) (PCRA discovery rule does not require court to order Commonwealth to turn over discovery in absence of good cause).
*192 In denying the above-referenced discovery requests, the PCRA court emphasized that Brown had made no showing of good cause. With respect to the gun found under the vehicle where he was hiding, Brown argued that the area where the vehicle had been located was unsecured for several hours before the gun was found, and thus the crime scene could have been contaminated. The PCRA court, however, demonstrating the "fishing expedition" nature of this claim, pointed out that Brown offered no substantial reason to believe that the crime scene was in fact contaminated, but rather only that it could have been contaminated. PCRA Court Opinion, 12/6/2016, at 14. Moreover, the PCRA court acknowledged that the Commonwealth introduced testimony at trial, from police officers, that the area around the vehicle had been secured during the entire time in question. Id. (quoting N.T., 5/26/2005, at 164-65).
Similarly, with respect to the clothing he was wearing when arrested, Brown contended that he wanted to have it tested for the presence of gunshot residue or blood spatter. According to the PCRA court, Brown offered no good cause to demonstrate that the testing of these items would be exculpatory to him. Id. at 15. Moreover, the PCRA court indicated that the Commonwealth introduced, in connection with the discovery request, a detailed report from the Philadelphia Police Department's Criminalistics Unit, setting forth multiple reasons why it was unlikely that there would been gunshot residue or blood spatter on the clothing (e.g., the distance between Brown and Crawford, Brown's multiple layers of clothing, the rubbing of his clothes on the ground while hiding under the vehicle). Id.
Brown also sought reports from police/detectives, whom crime scene technicians recorded as being present at the scene, to support his theory that the crime scene was not secure and thus could have been contaminated. The PCRA court again found the absence of good cause for the request, indicating that "[s]hort of his theory of contamination," Brown failed to allege any facts to establish that even if these documents existed, they would prove contamination of the evidence at the crime scene. Id. at 15-16 ("Without providing at least a theory as to how the requested materials would have supported this claim, petitioner failed to show good cause and was not entitled to discovery pursuant to Pa.R.Crim.P. 902(E)").
A claim that a PCRA court erred by denying a discovery request is governed by an abuse of discretion standard. Commonwealth v. Chambers , 570 Pa. 3, 807 A.2d 872, 889 (2002). Based upon the certified record in this case, we discern no basis for a finding of an abuse of discretion. We note that in his brief filed with this Court, Brown continues to assert an entitlement to these materials, but he does not contend that he established good cause in the PCRA court for his discovery requests. Instead, he merely insists that the denial of his requests "made it impossible to conduct a reasonable investigation" of his claims of ineffective assistance of counsel. Brown's Brief at 101. Based upon our review of the law in the area, such a general statement of intent to investigate does not constitute good cause shown.
With respect to Brown's claim that he should have been provided a full evidentiary hearing on all of his PCRA claims, the law in this area is clear:
[T]he PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, *193 and no legitimate purpose would be served by further proceedings." Commonwealth v. Paddy , 609 Pa. 272, 15 A.3d 431, 442 (2011) (quoting Pa.R.Crim.P. 909(B)(2) ). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." Id. (quoting Commonwealth v. D'Amato , 579 Pa. 490, 856 A.2d 806, 820 (2004) ). We stress that an evidentiary hearing "is not meant to function as a fishing expedition for any possible evidence that may support some speculative claim of ineffectiveness." Commonwealth v. Jones , 571 Pa. 112, 811 A.2d 994, 1003 n. 8 (2002) (citation omitted).
Commonwealth v. Roney , 622 Pa. 1, 79 A.3d 595, 605 (2013).
Brown contends that all of the issues he presented to the PCRA court were meritorious and involved genuine issues of material fact. Brown's Brief at 102. The PCRA court disagreed, stressing that it extensively reviewed the pleadings and available evidence and subsequently provided Brown with a sixty-three-page notice explaining, in detail, why there were no issues upon which it could grant PCRA relief. As discussed hereinabove, the PCRA court granted an evidentiary hearing as to one issue involving an affidavit from Hayes, but Brown failed to produce Hayes as a witness at this hearing. As to all of the other issues, we agree with the PCRA court that Brown does not to raise any genuine issues of material fact that would entitle him to relief. In light of our standard of review, we find no abuse of discretion in the PCRA court's denial of an evidentiary hearing.
Order affirmed.
Justices Baer, Dougherty and Mundy join the opinion.
Justice Dougherty files a concurring opinion in which Justice Baer joins.
Justice Wecht files a concurring opinion.
Chief Justice Saylor files a dissenting opinion in which Justice Todd joins.
I join the majority's well-reasoned opinion in all respects. I write separately only to further address the Philadelphia District Attorney's Office's newly-minted "confession of error," and its extraordinary assertion this Court is required to vacate appellant's death sentence simply because it now agrees with appellant such relief is due.
It is a long-standing and venerable rule that a party's "[c]onfessions of errors are, of course, entitled to and given great weight, but they do not 'relieve this Court of the performance of the judicial function.' " Sibron v. New York , 392 U.S. 40, 58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), quoting Young v. United States , 315 U.S. 257, 258, 62 S.Ct. 510, 86 L.Ed. 832 (1942). Notwithstanding this settled principle, which this Court has consistently adhered to, the District Attorney claims that "when a prosecutor makes a reasoned fact and policy-based decision not to defend a particular conviction or sentence, it is proper for the Court to remand for the imposition of the agreed-upon relief" without conducting an independent review of the claim's merit. District Attorney's Brief at 3 (emphasis added). That is a remarkable proposition, and one that finds no support in the law, as the majority properly concludes.
The statutory requirements for obtaining relief under the PCRA are straightforward and crystal clear: a petitioner "must plead and prove by a preponderance of *194 the evidence" that "the conviction or sentence resulted from one or more" of the delineated categories of legal error . 42 Pa.C.S. § 9543(a)(2). These statutory commands are not mere suggestions. Moreover, the District Attorney's late show of support for appellant cannot change the express dictates of the statute. This, of course, is not to say that a district attorney may never agree that a petitioner's claim warrants relief under the PCRA. As the Attorney General cogently explains, a "prosecutor is of course privileged to take a position on that claim; indeed, duty requires that he or she do so, in accordance with her good faith understanding of the applicable law. But the statute does not empower her to assume the role of the court, which is to decide." Attorney General's Brief at 10.
The majority agrees with this reasoning, which is why I join its opinion in full. However, given the widespread implications of the District Attorney's position in this case and the potential for recurrence in others, I believe a few observations are in order.
In my view, the fundamental principles of law and statutory commands discussed above and in the majority opinion extend far beyond the circumstances of this particular case. For one thing, although this case comes to us on our capital appeal docket, nothing in the majority's analysis hinges on the capital nature of the case. Thus, the result we reach in this particular capital case would be precisely the same if, for example, a district attorney "stipulated" or "confessed" that a life sentence was no longer appropriate for a defendant previously convicted of second-degree murder because the district attorney no longer believed that punishment fit that crime. In other words, if the court is not first satisfied some legal error has been proven, it must deny relief, notwithstanding the unity of the parties' position the sentence should be vacated. This rule would apply in any criminal case, no matter the crime involved.
Second, I view the principles of law articulated by the majority as applying to all courts in this Commonwealth, rather than just reviewing courts. In this regard, I disagree with Justice Wecht's suggestion the Court should leave open the possibility that a PCRA court, as opposed to a court sitting in an appellate capacity, "may premise its ruling upon the parties' stipulation or the Commonwealth's confession of error[.]" Concurring Opinion, at 196 (Wecht, J.). Again, I agree with the Attorney General that "a prosecutor's confession of error is properly viewed not as dispositive , but as persuasive, often highly persuasive." Attorney General's Brief at 3 (emphasis added).[1] Thus, while a prosecutor's confession as to the merit of a claim for post-conviction relief would generally be worthy of a PCRA court's respect, it would not absolve the court of its judicial duty to independently review the confessed error to ensure it meets the strict requirements of the PCRA.[2]
*195 To hold otherwise would be to bless local district attorneys and PCRA courts with a commutation power that does not lawfully belong to them. See Majority Opinion, at 144 ("neither the parties, by agreement, nor [a court], absent a finding of legal error, have the power or ability to order that the jury's verdict be commuted"); see also PA. CONST. art. IV, § 9 ("the Governor shall have power ... to grant reprieves, commutation of sentences and pardons"). Indeed, in the past this Court has not hesitated to exercise its extraordinary judicial power to step in when the parties combine to set aside an otherwise lawful jury verdict or sentence and a court authorizes such an agreement in the absence of legal authority to do so. See Commonwealth v. Chimenti , 510 Pa. 149, 507 A.2d 79 (1986) (exercising plenary jurisdiction and reversing where Philadelphia District Attorney's Office struck a deal, which it effectuated by appellate motion, to vacate Chimenti's first-degree murder conviction and replace it with a conviction for murder generally); see also 42 Pa.C.S. § 726 ("Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done."). Simply put, there is no exception in the law that allows a PCRA court to avoid the performance of its judicial function, even in the face of a confession of error by the government, and this Court has not and will not tolerate subversion of the proper judicial process or the requirements of the PCRA.[3] The requirement that post-conviction relief may be afforded only where there exists legal error is clear, and it precludes blind acceptance of a "confession of error" by any court in this Commonwealth.
With these observations, I join the majority's opinion.
Justice Baer joins this concurring opinion.
Following his conviction in 2005, Lavar Brown was sentenced to death. He exhausted his direct appeal rights, and then sought review pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541 -46. The Commonwealth opposed Brown's claims before the PCRA court, and the PCRA court denied relief. While Brown's appeal of that denial was pending, the Commonwealth reevaluated its position with respect to Brown's claim that his trial counsel provided ineffective assistance during the penalty phase of his trial. Based upon its reevaluation, the Commonwealth, before this Court, now agrees with Brown with respect to this claim. This unusual circumstance presents our Court with the opportunity to explore the extent, if any, to which we are bound by the Commonwealth's confession of error.
*196 The Majority holds that this Court is not bound by the Commonwealth's confession of error. The Majority's conclusion rests upon its consideration of the respective roles of the prosecutor and the courts, and upon the finality of a jury's verdict absent a judicial finding of legal error. I agree with much of the Majority's analysis as it pertains to this Court's review of the PCRA court's denial of relief in this case, and I accordingly concur in today's result.
Unlike the Majority, I would eschew broad pronouncements in this case about a hypothetical scenario not presented in which the Commonwealth confesses error directly to the PCRA court itself . In such circumstances, it may be appropriate for the PCRA court to defer to the Commonwealth's confession of error. Accordingly, I distance myself from any suggestion that a confession of error can have no impact on a trial court's review of the issues before it. Maj. Op. at 146.[1]
To be eligible for relief under the PCRA, a petitioner must satisfy certain criteria including, as relevant here, a showing that the conviction or sentence resulted from the ineffective assistance of counsel that "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). If the PCRA court "rules in favor of the petitioner, it shall order appropriate relief...." 42 Pa.C.S. § 9546(a). In ruling on the petition, the PCRA court must make a decision in favor of one party or another. Unlike the Majority, I do not believe that requiring a judicial ruling on a claim of error resolves whether the PCRA court may premise its ruling upon the parties' stipulation or the Commonwealth's confession of error, or must instead delve into a merits review of an undisputed claim. Rather, a ruling is simply a finding in favor of one of the parties before the court, whatever that ruling's basis.
The PCRA court is tasked with considering the facts before it and resolving factual disputes. If there is no factual dispute because the Commonwealth and the petitioner are in agreement regarding the petitioner's entitlement to relief, then the role of the PCRA court is to resolve the legal implications of these facts. If the Commonwealth and the petitioner agree about the legal consequences, then it may be appropriate for the PCRA court to afford a quantum of weight to the Commonwealth's confession of error.[2]
*197 Prosecutors in this Commonwealth have a general obligation to seek justice. See Berger v. United States , 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ; Commonwealth v. Chmiel , --- Pa. ----, 173 A.3d 617, 631 (2017) (Donohue, J., concurring). The Commonwealth's reevaluation of criminal convictions is consistent with this general obligation. When a petitioner's life hangs in the balance, the prosecutor has a heightened obligation to continue to review the merits of the case. Accordingly, when confronted with a PCRA petition alleging that the petitioner is eligible for relief under the PCRA, it is a valid exercise of discretion for a prosecutor to determine whether to contest the claims before the PCRA court. The Commonwealth's concession that a defendant's judgment of sentence does not serve the interests of justice may, in some instances, be entitled to deference by the PCRA court.
Although a confession of error may be entitled to a level of deference when it is presented to the PCRA court, the same is not true where (as here) it is presented to this Court for the first time on appeal from the PCRA court's order. In resolving an appeal under the PCRA, the role of this Court is to examine whether the PCRA court's ruling is supported by the record and free from legal error. Commonwealth v. Mitchell , 629 Pa. 572, 105 A.3d 1257, 1265 (2014). When the PCRA court resolves a claim without the benefit of the Commonwealth's confession of error, our standard of review remains the same. To overcome the PCRA court's judgment, the parties would have to demonstrate on the merits that the judgment resulted from legal error. A confession of error does not displace this Court's obligation to examine the PCRA court's order in a manner consistent with our established standard of review.
Accordingly, I agree with the Majority that there is no basis for this Court to disturb the PCRA court's order absent a finding of legal error. In today's case, the Commonwealth has established no such error. That suffices to dispose of the appeal before us. But the future could bring other cases. We should not foreclose them now. I believe that we must remain open to the possibility that it may be appropriate for a PCRA court to accept a future confession of error and defer to the prosecutor's judgment that justice has not been served by the conviction under the circumstances there presented. Our law should not rule out such possibilities.
I respectfully dissent, as I conclude that the PCRA court should not have limited the evidentiary hearing to a single claim. See generally Commonwealth v. Hutchinson , 611 Pa. 280, 363, 25 A.3d 277, 325-26 (2011) (Saylor, J., dissenting) ("[I]n line with many of my previous expressions, I believe that the appropriate way for this Court to address the intractable difficulties which have arisen in the death-penalty arena is to consistently enforce the requirement of an evidentiary hearing where material facts are in issue; to require appropriately developed factual findings and legal conclusions of the PCRA courts; and to apply consistent and fair review criteria on appeal."). I also would approve the present resentencing agreement, and I *198 take this opportunity to write to several penalty issues, the first of which, in my view, illustrates the unfairness in the summary dismissal of potentially colorable claims.
Organicity
In support of his claim of ineffective assistance of trial counsel in failing to adduce evidence of brain damage in the penalty phase of his capital trial, Appellant submitted an affidavit from his lead trial attorney indicating as follows:
My trial file contained a copy of results of a 1995 psychological evaluation done of Lavar Brown by Kenneth Moberg. Moberg found a "significant sign of organicity on the Bender-Gestalt test." I know of no tactical or strategic reason why neuropsychological testing was not done in light of this report.
Affidavit/Declaration of Daniel A. Rendine, Esq. dated April 23, 2014, in Commonwealth v. Brown , CP-51-CR-0208091-2004 (C.P. Phila.) (emphasis added).
Despite this troublesome concession, the majority and the PCRA court have discerned no basis for conducting a hearing to allow for factual development of this claim. See Majority Opinion, at 151-58. In this regard, unlike counsel himself, the majority and the PCRA court attribute any failure to the defense penalty-phase expert, Allan Tepper, Psy.D. See, e.g. , Majority Opinion, at 157 ("[A]n ineffectiveness claim cannot be based upon an assertion that counsel failed to spot a 'red flag' that the [defense] mental health expert failed to spot.").
Neither the majority nor the PCRA court, however, directly indicate that competent capital lead counsel would not know what the term "organicity" -- i.e. , brain damage -- means in the relevant context. See generally Commonwealth v. Sepulveda, 618 Pa. 262, 343, 55 A.3d 1108, 1156 (2012) (Saylor, J., concurring) ("As of the time of [the a]ppellant's trial ..., it was well understood in the training readily available to capital defense attorneys that potential mental-health issues are essentially ubiquitous in capital cases[.]"); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES § 4.1, commentary (rev. ed. 2003), reprinted in 31 HOFSTRA L. REV. 913 (2003). Nor would competent counsel overlook its potential significance to capital sentencing jurors. See, e.g. , Hooks v. Workman , 689 F.3d 1148, 1205 (10th Cir. 2012) ("Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect." (citations omitted) ). Indeed, one can readily glean from counsel's affidavit that he both apprehends what organicity means and its potential significance in capital sentencing proceedings.[1]
To the degree that the majority opinion reflects a bright-line rule that the retention of an expert witness insulates capital defense counsel from further scrutiny in terms of the adequacy of his or her stewardship relative to mental-health mitigation, I respectfully differ with this perspective.[2] Experts are utilized by capital *199 counsel to assist in the litigation, not to supplant counsel's obligation to orchestrate and conduct the defense.
Furthermore, I find Dr. Tepper's attestations to be relevant. In his affidavit, he stated that: it is his practice to request relevant background records prior to evaluating a defendant; defense counsel had not forwarded such records to him prior to his examination of Appellant less than two months before trial; and it was because of the impending trial date that "it was necessary to meet with Mr. Brown prior to receiving and reviewing the outstanding background records." Declaration/Affidavit of Dr. Allan M. Tepper, dated May 12, 2014, in Commonwealth v. Brown, CP-51-CR-0208091-2004 (C.P. Phila.), at ¶¶ 4, 6 (hereinafter "Tepper Affidavit at ----"). Dr. Tepper further explained that he is not trained as a neuropsychologist, and thus, he did not administer neuropsychological testing. See id. at ¶ 6.
According to Dr. Tepper's affidavit, counsel contacted him a single time by telephone in preparation for his penalty hearing testimony, speaking for about twenty-four minutes. See id. ¶ 12. Additionally, Dr. Tepper expressed the belief that he discussed the issue of brain damage with counsel at that time. See id. at ¶ 13.
In terms of his testimony at the penalty hearing, Dr. Tepper indicated as follows:
During the course of my June 1, 2005 testimony, [penalty counsel] asked me to address the issue of possible underlying brain damage. At that time, I testified that a prior 1995 psychological evaluation had raised the possibility of underlying brain damage. Given the available clinical data, however, I was unable to testify with psychological certainty the nature and extent of any possible underlying brain damage, or the impact that such underlying brain damage would have had upon Mr. Brown's behavior. For this reason, I responded to the question of possible brain damage based upon the presently available clinical data and background information.
Id. at ¶ 14.
In light of the above factual recitations -- which the Court is obliged to take as true for purposes of reviewing the PCRA court's decision to summarily dismiss the relevant post-conviction claim -- I do not believe that the fault for failing to investigate the indicia of brain damage should be precipitously laid at the feet of Dr. Tepper. Rather, I find that material facts are in issue, such that an evidentiary hearing was required. See Pa.R.Crim.P. 908(2) (requiring a hearing "when the petition for post-conviction relief or the Commonwealth's answer, if any, raises material issues of fact"). See generally Commonwealth v. Keaton , 615 Pa. 675, 749-50, 45 A.3d 1050, 1095 (2012) (Saylor, J., concurring and dissenting) ("I continue to believe that the absence of an adequate factual foundation for consideration of capital post-conviction claims encourages unwarranted analytical shortcuts in the appellate review.").[3]
*200 This brings me to the joint application to remand for resentencing to life imprisonment without parole. Over the past few decades, this Court has been presented with a great deal of evidence that the capital punishment regime in Pennsylvania is severely broken, including in a plethora of cases in which defense counsel have been shown to have been patently ineffective. See, e.g. , Commonwealth v. King , 618 Pa. 405, 453-57, 57 A.3d 607, 636-38 (2012) (Saylor, J., concurring specially) (cataloguing a sampling of capital cases in which relief has been granted in Pennsylvania state courts).[4] Notably, in 2011, the Court exercised its extraordinary jurisdiction to consider a petition challenging Philadelphia's compensation system for counsel representing indigent capital defendants, under which the present capital case was tried. In this litigation, an appointed special master reported his findings that such system "is grossly inadequate," "completely inconsistent with how competent trial lawyers work," "punishes counsel for handling these cases correctly," and "unacceptably increases the risk of ineffective assistance of counsel in individual cases." Report and Recommendations in Commonwealth v. McGarrell , 77 EM 2011, CP-51-CR-0014623-2009 (C.P. Phila. Feb. 21, 2012), at 2, 17.
This Court never completed a substantive review of the special master's findings since, over the dissents of Justice Todd, former Justice McCaffery, and myself, a majority of the Court dismissed the petition after the First Judicial District's Administrative Governing Board implemented a five-fold increase in the fees to be *201 paid to defense counsel in capital cases on a prospective basis. For the sake of perspective, I reproduce my dissenting statement lodged against such dismissal in its entirety:
During my tenure on the Court I have been dismayed by the deficient performance of defense counsel in numerous Pennsylvania death-penalty cases. Recently, I collected some observations in my special concurrence in Commonwealth v. King, 618 Pa. 405, 57 A.3d 607, 633-38 (2012) (Saylor, J., concurring specially), including a sampling of instances of substandard lawyering and remarks about the present litigation, which I incorporate by reference here.
Significantly, Pennsylvania has long been on notice that leaders of national, state, and local bar associations do not believe that capital litigation is being conducted fairly and evenhandedly in the Commonwealth, not the least because of the ad hoc fashion by which indigent defense services are funded from the local government level.[1] Such concerns are consistent with vast compilations of literature containing evidence of long-standing, chronic underfunding of public defense systems in the United States. See generally Nat'l Right to Counsel Comm., Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel, CONST. PROJECT 2-3 (2009).[2] Nevertheless, this Court seems unable to attend to the apparent systemic difficulties in individual capital cases considered on appeal, as, doctrinally, the adjudicatory focus is on the facts at hand relative to an array of widely disparate claims of deficient stewardship.
Thus, the present litigation offers an essential opportunity for this Court to address a systemic challenge amidst much evidence that Pennsylvania's capital punishment regime is in disrepair. See King, 57 A.3d 607, 633-38 (Saylor, J., concurring specially). While the local government in Philadelphia has undertaken to implement some modest reform measures relative to legal-services funding in the death-penalty arena, Petitioners reasonably question the adequacy of such changes, while pointing to other jurisdictions in which the courts have assumed a more active role. See, e.g., State v. Young, 143 N.M. 1, 172 P.3d 138, 140 (2007) (collecting cases from courts exercising "inherent authority to ensure that indigent defendants receive constitutionally adequate assistance of counsel.").
In summary, I believe that Petitioners' challenge to the funding of legal services for indigent capital defendants in the First Judicial District presents an opportune vehicle for deeper, developed review and explication by this Court about fundamental fairness in the highest-stakes criminal prosecutions. Ideally, the Court's further consideration might also serve as a springboard to a collaborative conversation among the judicial, legislative, and executive branches to institutionalize statewide remedies and facilitate ongoing improvements.[3]
In light of the above, I am unable to support either the majority's decision to dismiss the petition summarily or its pronouncement that "the continued oversight of this Court is no longer required."
_________________________
[1]See, e.g., ABA, Evaluating Fairness and Accuracy In State Death Penalty Systems: The Pennsylvania Death Penalty Assessment Report iii (Oct. 2007) ("The Pennsylvania Death Penalty Assessment Team has identified a number of areas in which Pennsylvania's death penalty system falters in affording each *202 capital defendant fair and accurate procedures," including in the failure to protect against poor defense lawyering[.]").
[2] Petitioners also cite evidence suggesting there is large disparity in terms of disposition results obtained on behalf of homicide defendants whose legal interests are advanced by the salaried attorneys of the Defender Association of Philadelphia and those represented by court-appointed lawyers subject to modified flat-fee arrangements. See James M. Anderson & Paul Heaton, How Much Difference Does the Lawyer Make? The Effect of Defense Counsel on Murder Case Outcomes, 122 YALE L.J. 154, 159-60 (2012). Notably, the statistically better outcomes are attained by the Defender Association, which, in capital litigation, adheres to the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Reprinted in 31 HOFSTRA L. REV. 913 (2003).
[3] The importance of legislative involvement cannot be overstated. State-level funding for indigent defense services-presently lacking in Pennsylvania and only one other state in the nation-is at the core of nearly every reform recommendation. See, e.g., Nat'l Right to Counsel Comm., Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel, CONST. PROJECT 11-12, 54. While certainly, governments are currently operating under financial pressures, the Legislature has made the decision to authorize capital punishment in the Commonwealth. Accordingly, it and subordinate instrumentalities must ensure adequate funding to meet all attendant constitutional mandates, including the requirement for the Commonwealth to provide effective attorney stewardship for indigent defendants.
Commonwealth v. McGarrell , 624 Pa. 625, 626-28, 87 A.3d 809, 810-11 (2014) (Saylor, J., dissenting).
In light of the accumulated and accumulating evidence, I have questioned how it is that the Court can maintain the presumption of effective representation, at least in its present forceful permutation, in the face of so much evidence of the systemic obstacles. See, e.g. , King , 618 Pa. at 452, 57 A.3d at 636 (Saylor, J., concurring specially); cf. Commonwealth v. Jette , 611 Pa. 166, 191, 23 A.3d 1032, 1047 (2011) (Saylor, J., concurring) (commenting, in a non-capital case, that "it remains troubling that courts shape the review process based on presumptions and pronouncements that are not empirically verified, while sometimes demonstrating limited sensitivity toward other vital interests at stake in criminal justice."). This is particularly true, in light of the disturbing -- and yet unreviewed -- findings of the special master, relative to indigent capital defendants represented by private counsel in Philadelphia, such as Appellant, prior to the implementation of modest, untested reforms in 2014. Cf. Commonwealth v. Roney , 622 Pa. 1, 90, 79 A.3d 595, 648 (2013) (Saylor, J., dissenting) (observing that the special master's findings "suggest against sanctioning the use of summary dismissals skirting governing law and procedural protections at the post-conviction stage").
In the present case, the District of Attorney of Philadelphia represents that a committee from his office has carefully reviewed the matter as to whether it remains appropriate to defend the imposition of the death penalty on the existing record. See Brief for the Commonwealth at 8. In light of this consideration, to which I would afford substantial deference, as well as the nature of the claim asserted, the supporting attestations, and the landscape of apparent underfunding in which counsel *203 operated, I would proceed to grant the joint motion for resentencing.
To the degree that the majority relies on past precedent as foreclosing such approval, I observe that the Supreme Court of the United States has recognized that "execution is the most irremediable and unfathomable of penalties; ... death is different." Ford v. Wainwright , 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986).[5] Particularly in light of the notice provided by the special master, it is not appropriate, in my view, for this Court to enforce capital punishment when the official prosecuting authority in Philadelphia tenders a good faith and colorable representation that it simply is not appropriate. I also observe that some consideration is due to the vast expenditure of resources that must be dedicated to the ongoing pursuit of a death sentence through the state and federal litigation process. In this regard, it is not unrealistic to suggest that the present thirteen-year-old case is at least another decade away from approaching a final resolution. As such, I find it untenable that the District Attorney must be tasked with expending the substantial time and resources involved in the protracted defense of a death sentence which he agrees is unsustainable on post-conviction review.[6]
Mitigation as an Excuse
Regarding Part VII(c), see Majority Opinion, at 180-82, I agree with those jurisdictions that would disapprove the reflexive portrayal by prosecutors of mitigating evidence as being in the nature of "an excuse." See, e.g. , Brooks v. State , 762 So.2d 879, 904 (Fla. 2000) (finding that a prosecutor's repeated characterization of mitigating circumstances as "excuses" was "clearly an improper denigration of the case offered by [the defendants] in mitigation."); accord Commonwealth v. Spotz , 610 Pa. 17, 199-200, 18 A.3d 244, 353 (2011) (Saylor, J., concurring). Jurors charged with capital sentencing are not in a position of excusing murder; rather, they must make a reasoned, moral choice of the appropriate punishment as between a sentence of life imprisonment and a death sentence. Accord Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989). Prosecutors who encourage jurors to accept superficial shortcuts to forego consideration of bona fide mitigating evidence of a type designated by the Legislature as mitigating do a disservice to the fair and evenhanded administration of the death penalty.
Future Dangerousness
Finally, I note that, in Part X of its opinion, the majority misstates the applicable federal constitutional law concerning the necessity of a life-means-life instruction when a prosecutor injects future dangerousness into capital sentencing proceedings. Compare Majority Opinion, at 186-87 (asserting that prior violent felonies have no bearing on a defendant's future dangerousness, based on decisions of this Court relative to trials that preceded *204 Kelly v. South Carolina , 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002) ), with Kelly , 534 U.S. at 253, 122 S.Ct. at 731 ("A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior" in the future).[7]
Contrary to the majority's portrayal, see Majority Opinion, at 186-87 n.24, I do not mean to suggest that Kelly establishes a per se rule that the admission of any act of prior violence requires a Simmons instruction. But cf. Kelly , 534 U.S. at 260, 122 S.Ct. at 735 (Rehnquist, J., dissenting) (asserting that the majority decision in Kelly necessitates a Simmons charge in every case in which there has been a brutal murder, since it requires the instruction not only when the state argues that the defendant will be dangerous in the future, but also on account of the admission of evidence "from which a jury might infer future dangerousness"). What I do mean to convey is that Kelly clearly conflicts with the opposing bright-line rule advanced by the majority -- deriving from the decisions of this Court arising out of pre- Kelly trials -- that a prosecutor's allusions to a capital defendant's prior violent acts cannot implicate future dangerousness.
Justice Todd joins this dissenting opinion.

As discussed hereinbelow, Gonzalez did not testify at trial.

The jury rejected Brown's arguments with respect to the existence of the following mitigating circumstances:
(2) The defendant was under the influence of extreme mental or emotional disturbance.
(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
(4) The age of the defendant at the time of the crime.
* * *
(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.
42 Pa.C.S. § 9711(e)(2)-(4), (8).

See 42 Pa.C.S. § 9546(d) (providing that "[a] final court order under this subchapter in a case in which the death penalty has been imposed shall be directly appealable only to the Supreme Court pursuant to its rules").

This Court granted leave to permit Fair and Just Prosecution ("FJP"), a national network of current and former state and federal prosecutors, district attorneys, state attorneys general, and Department of Justice officials, to file an amicus brief in support of the Joint Motion. FJP indicates that while the positions of its members may differ with respect to the death penalty, they are "fully aligned in their commitment to the thoughtful and just exercise of prosecutorial discretion." FJP's Brief at 1. FJP urges this Court to "accord due consideration to the Commonwealth's position ... that imposing the death penalty on [Brown] would not serve the interests of justice," id. at 3, and that a decision by this Court to "override" the Commonwealth's recommendation here "may have implications beyond this case." Id. at 2.

Article 4, Section 9 of the Pennsylvania Constitution delegates the "high power" to commute a sentence of death to the Governor, based upon a unanimous recommendation of the Board of Pardons. Pa. Const. art. 4, § 9. The power of commutation is an adjunct of the pardoning power and can be granted only by the authority in which the pardoning power resides. Commonwealth v. Sutley , 474 Pa. 256, 378 A.2d 780, 789 n.12 (1977).

Noting the policy of Pennsylvania appellate courts to vacate civil judgments when the parties resolve the case by settlement, see, e.g., Goodman v. Kovacs , 458 Pa. 615, 321 A.2d 650, 651 (1974), Brown and the Commonwealth argue that the same practice should obtain here because the PCRA is "quasi-civil in nature." Commonwealth's Supplemental Brief at 5; Brown's Supplemental Brief at 4. This Court has observed that PCRA proceedings bear some similarities to civil actions, including that it is the criminal defendant, rather than the Commonwealth, who must initiate the claim and satisfy the required burden of proof by a preponderance of the evidence. See Commonwealth v. Haag , 570 Pa. 289, 809 A.2d 271, 284 (2002). These similarities, however, do not convert PCRA proceedings, which unquestionably involve criminal cases, into civil matters or otherwise compel the application of policies relating solely to civil matters.

Charges may be challenged on the grounds of selective prosecution, and charges not brought may be raised in private criminal complaints. Pa.R.Crim.P. 506.

These decisions are subject to the notice and right-to-be-heard provisions of the Crime Victims Act, 18 P.S. §§ 11.101 -11.5102. The record in this case does not disclose that the victim's family has been notified of the pending Joint Motion.

Brown and the Commonwealth argue that this Court has routinely accepted concessions of error without conducting independent judicial review. Based upon our review of the cases cited, we cannot agree. In Commonwealth v. Irelan , 341 Pa. 43, 17 A.2d 897 (1941), the Court addressed a circumstance in which the trial court, upon the acceptance of a guilty plea to the murder of her infant son, sentenced the defendant to death. Pursuant to the law applicable at that time, 18 P.S. § 4701 (repealed), in cases of murder convictions resulting from guilty pleas, the trial court could sentence the defendant either to life in prison or death. On appeal to this Court, the defendant challenged the trial court's sentence as an abuse of discretion. Id. at 44. While acknowledging the Commonwealth's position that the sentence should have been set at life imprisonment, this Court conducted a thorough review of the facts supporting her conviction, including the lack of a prior criminal record, the testimony of psychiatrists that she was "at least at the very minimum level of intelligence," and that "under fair conditions of life, living with the right kind of people, not pressed by extreme poverty, this would not have happened to her." Id. at 46. Based upon our independent judicial review, we reversed the sentence set by the trial court. Id. at 44.
Brown and the Commonwealth also point to two per curiam orders in which we remanded cases for resentencing. Commonwealth v. Washington , Nos. 352-353 CAP (unpublished order); Commonwealth v. Snyder , 642 Pa. 715, 171 A.3d 267 (2017). While Brown and the Commonwealth indicate that both cases involved agreements between district attorneys and the defendant, we reject the suggestion that we entered the orders without independent judicial review. Both cases had previously been the subject of detailed review by this Court, and thus we were intimately familiar with the factual and procedural postures of the cases. In Washington , for example, the Court had already published a lengthy opinion discussing the merits of the case. Commonwealth v. Washington , 583 Pa. 566, 880 A.2d 536 (2005).

Brown and the Commonwealth have directed us to a limited number of instances in which the Supreme Court accepted concession of error without conducting independent judicial review, albeit in circumstances unrelated to those confronting us in the present instance. In Petite v. U.S. , 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), the Court agreed to remand the case based upon the Solicitor General's representation that the government had failed to follow its own departmental policy of trying all offenses arising out of the same transaction together. Id. at 530, 80 S.Ct. 450. While the majority was careful to indicate that "we are of course not to be understood as remotely intimating in any degree an opinion" on the double jeopardy issue before the Court, the decision nevertheless drew a sharp dissent from three members of the Court. Justice Brennan, joined by Justices Black and Douglas, insisted that "[e]ven where the Government confesses error, this Court examines the case on the merits itself." Id. at 533, 80 S.Ct. 450 (Brennan, J. dissenting) (citing Young ).
In Casey v. United States , 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1952), the Court remanded a case to reconsider the facts associated with an unreasonable search and seizure. Again in dissent, Justice Douglas stated that "I do not believe that we should take our law from the Department of Justice or from any litigant." Id. at 808, 72 S.Ct. 999. Emphasizing that Young set forth the proper policy of the Court with respect to concessions of error, Justice Douglas further indicated that "[w]e sit in this case not to enforce the requests of the Department of Justice but to review the action of a lower court," and "I cannot state too strongly my belief that if the courts are to retain their independence, they must decide cases taken on the merits." Id. at 811, 72 S.Ct. 999. "Once we accept a confession of error at face value and make it the controlling and decisive factor in our decision, we no longer administer a system of justice under a government of laws." Id. at 812, 72 S.Ct. 999.

In his supplemental brief, Brown argues that a refusal by this Court to grant the Joint Motion would constitute a violation of his constitutional rights, including in particular "the prohibition against arbitrary and capricious death sentences under the Eighth Amendment and the Due Process Clause." Brown's Supplemental Brief at 9. Brown makes no sustained attempt, however, to develop this argument. In addition to contending that prosecutorial discretion extends to "all stages of capital prosecutions," id. at 10, a proposition that we have largely rejected hereinabove, Brown cites only to McCleskey v. Kemp , 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) for the general proposition that "prosecutorial discretion is an indispensable element of any capital punishment system" that meets constitutional requirements. Brown's Supplemental Brief at 8. McCleskey , however, dealt with a claim that racial discrimination permeated "every actor in Georgia's capital sentencing process" (including prosecutors and juries). McCleskey v. Kemp , 481 U.S. at 292, 107 S.Ct. 1756. The Court held that McCleskey had failed to support his claims of discrimination with sufficient evidence, and that because prosecutorial discretion "is essential to the criminal justice process," "exceptionally clear proof" of an abuse of that discretion is required. Id. at 297, 107 S.Ct. 1756. The relevance of the McCleskey decision in the present context to Brown's claim of constitutional violations is unclear.

In its supplemental brief, the Commonwealth argues that counsel's failure to provide Dr. Tepper with Dr. Moberg's report until midtrial precluded him from testifying about the report or making recommendations regarding further testing. Commonwealth's Supplemental Brief at 18. Neither Dr. Tepper's in-court testimony nor his affidavit attached to Brown's PCRA petition, however, include any contention that the timing of his receipt of Dr. Moberg's report had any substantive effect on his trial testimony.

The Chief Justice's concern that there is no "affirmative" indication in the record that Dr. Tepper advised counsel that no further investigation into organicity was required, Dissenting Op. at 199-200 n.3, is semantical, as there is no requirement on PCRA review that this Court identify "affirmative" statements to support each of the PCRA court's factual findings. To the contrary, our standard of review provides that we "grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record." See, e.g., Commonwealth v. Henkel , 90 A.3d 16, 20 (Pa. Super. 2014) ; see also Spotz , 18 A.3d at 259 (citing Commonwealth v. Marshall , 596 Pa. 587, 947 A.2d 714, 719 (2008) ).
The PCRA court found, as a matter of fact, that Dr. Tepper did not recommend that additional neuropsychological testing be performed in advance of trial. Rule 907 Notice, 4/7/2016, at 52. This finding is supported by evidence of record, namely Attorney Rubino's affidavit. As indicated hereinabove, Attorney Rubino stated in her affidavit that if Dr. Tepper had recommended additional testing, she would have sought court funding to provide for it. It was well within the PCRA court's discretion to conclude that because Attorney Rubino did not seek court funding for this purpose, Dr. Tepper did not recommend any further investigation of organicity. Moreover, the affidavits of the three participants in the phone conversation in which Dr. Moberg's report was discussed (Dr. Tepper and Attorneys Rubino and Rendine) all indicate that none of them remember the substance of that conversation. As such, an evidentiary hearing on the issue of whether Dr. Tepper made an "affirmative" representation of the need for further neuropsychological testing would of necessity be a waste of the PCRA court's time.

For the same reason, we reject the Commonwealth's contention that counsel was ineffective for failing to "correct" Dr. Tepper's "erroneous testimony" at trial. Commonwealth's Supplemental Brief at 18. As discussed above, Dr. Tepper offered his expert opinions regarding Dr. Moberg's prior testing both to counsel pre-trial and on the witness stand at trial. It was clearly not counsel's role (or professional obligation) to "correct" Dr. Tepper with respect to his professional opinions, which would essentially require counsel to cross-examine her own expert and treat him as a hostile witness.

Attorney Rendine's observation that there was no "technical or strategic reason why neuropsychological testing was not done" would be significant only if Dr. Tepper had recommended to trial counsel that such testing be performed. In other words, absent a recommendation to perform testing that might result in useful mitigation evidence, trial counsel were never presented with the need to make a "technical or strategic decision" to request that it be performed.

Neither Brown, the Commonwealth nor the Chief Justice recommend that Lesko and/or Robinson be overruled. The Chief Justice notes that those cases involved "indicia of potential mental-health mitigation more subtle than a specific reference to potential organicity in the cognitive sense." DO at 198. This distinction is questionable, since in Lesko Dr. Crown offered a long list of "red flags" that the trial expert (Dr. Levit) failed to recognize - including "red flags" arising from the results of tests administered by Dr. Levit himself. In any event, this Court's decisions in those cases were not in any respect based upon the degree of subtlety, or lack thereof, of the "red flags" at issue, but rather centered on the relative roles of counsel and the mental health experts in identifying them.

The Chief Justice's contention that competent capital counsel would know the meaning of the word "organicity" in Dr. Moberg's report is perhaps true, but also not probative in this context. The fact that Dr. Moberg's report used this word is far from dispositive of whether additional testing needed to be performed. As Dr. Tepper's trial testimony reflects, the issue is not nearly that simple, as he was well aware of the contents of Dr. Moberg's report but nevertheless concluded that the record before him contained "no findings of any significant brain injury." N.T., 6/1/2005, at 235. Dr. Moberg's report explains that he performed a battery of psychological tests on Brown, including tests to evaluate his IQ (102), reasoning skills, auditory and visual memory, attention span, reading ability, and visual motor perception skills. PCRA Petition, Appendix, Moberg Report, Tab 37. Of these multiple tests, Dr. Moberg opined that the results of only one, the Bender-Gestalt test, reflected signs of "possible organicity." Id.
Dr. Tepper also administered his own series of psychological tests on Brown to assess his intellectual and emotional functioning, including the Quick Test Intelligence Inventory, the Sentence Completion test and the Thematic Apperception Test. PCRA Petition, Appendix, Tepper Affidavit, ¶ 5. In concluding that there was no finding of brain damage, Dr. Tepper obviously had to consider both Dr. Moberg's test results as well as his own. This analysis, requiring a synthesis of the results of different tests performed by different psychologists, plainly requires the expertise of a trained mental health professional, not the mere observation of the word "organicity" by trial counsel.

We note that Brown did not challenge the adequacy of the Kloiber charge on direct appeal.

42 Pa.C.S. § 9711(e)(8) sets forth a catchall mitigating circumstance, specifically, "Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8).

On September 20, 2006, the Superior Court affirmed Brown's second-degree murder conviction. Commonwealth v. Brown , 1036 EDA 2005, 911 A.2d 178 (Pa. Super. Sept. 20, 2006) (unpublished memorandum). This Court denied allocatur on May 15, 2007. Commonwealth v. Brown , 489 EAL 2006, 592 Pa. 764, 923 A.2d 1172 (Pa. May 15, 2007). Brown filed a pro se PCRA petition on July 24, 2007, and he subsequently filed a counseled petition on February 27, 2009. On October 7, 2011, the PCRA court dismissed Brown's petition. He appealed to the Superior Court, which affirmed the dismissal of his PCRA petition on April 9, 2013. Commonwealth v. Brown , 2939 EDA 2011 (Pa. Super. April 9, 2013) (unpublished memorandum).

Apparently in support of this claim, Brown cites to Kelly v. South Carolina , 534 U.S. 246, 253, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002) and Smith v. Texas , 543 U.S. 37, 41, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004). He neither provides any explanation for the relevance of these cases in the present circumstances nor offers any legal argument or analysis to this end. See generally In re S.T.S., Jr. , 76 A.3d 24, 42 (Pa. Super. 2013) (stating that appellate courts are "neither obliged, nor even particularly equipped, to develop an argument for a party. To do so places the Court in the conflicting roles of advocate and neutral arbiter."). As such, we will not attempt to incorporate these decisions into the present analysis.

Brown also contends that the Commonwealth elicited testimony regarding his lack of remorse, citing to Buck v. Davis , --- U.S. ----, 137 S.Ct. 759, 197 L.Ed.2d 1 (2017), for the proposition that lack of remorse may be a factor in support of a finding of future dangerousness. Brown's Brief at 86. Brown does not, however, cite to the testimony of any particular witness. Brown may be referring to questions addressed to his grandfather, discussed infra, in which the prosecutor asked, inter alia, if Brown had ever expressed remorse for his participation in the robbery that led to the death of Michael Richardson in the Rite Aid robbery. N.T., 6/1/2005, at 197-98. Brown does not explain how these questions bore on the issue of future dangerousness, especially since his grandfather testified that remorse was not at issue because Brown had consistently told him that he was not at the Rite Aid at the time of the robbery and murder. Id.

Contrary to the Chief Justice's dissenting opinion, this Court has repeatedly and without exception ruled that a prosecutor's references to a defendant's prior violent felony convictions do not implicate future dangerousness necessitating a Simmons instruction. See, e.g. , Chmiel , 889 A.2d at 538 ; Commonwealth v. May , 551 Pa. 286, 710 A.2d 44, 47 (1998) (stating that no Simmons instruction was required because "[t]he aggravating circumstance of appellant's prior record for violent felonies addressed only appellant's past conduct, not his future dangerousness"); Commonwealth v. Champney , 574 Pa. 435, 832 A.2d 403, 458 (2003) ("the aggravating circumstance of a significant history of prior violent felony convictions involves only the defendant's past conduct, not his future dangerousness"); Commonwealth v. Rompilla , 554 Pa. 378, 721 A.2d 786, 795 (1998) (finding that future dangerousness was not at issue when the Commonwealth argued the aggravating circumstance that appellant had a significant history of felony convictions involving the use or threat of force), overruled on other grounds by , Rompilla v. Beard , 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).
The Supreme Court in Kelly did not rule that the mere recitation of a prior record of violent felonies, without more, puts the defendant's future dangerousness at issue. In Kelly , the prosecutor compared the defendant to a notorious serial killer, called him a "dangerous" "bloody" "butcher," and expressed his hope that the jurors would "never in [their] lives again have to experience ... [b]eing some thirty feet away from such a person" as Kelly. Kelly , 534 U.S. at 255, 122 S.Ct. 726. These arguments implied that the imposition of a death sentence was "an act of self-defense" as they invited the jury to infer "that petitioner would be let out eventually if the jury did not recommend a death sentence" and would thus "pose a continuing threat to the community." Id. (quoting Simmons , 512 U.S. at 176, 178, 114 S.Ct. 2187 (O'Connor, J., concurring in judgment) ).

As the Attorney General aptly illustrates, the persuasive effect of a district attorney's confession of error will be greater, or lesser, depending on the credibility of the advocate:
A confession of error, for example, may be especially credible, because prosecutors generally seek to uphold their convictions, and when on occasion they do otherwise, their concession will carry great weight. If, on the other hand, a district attorney confesses error in a large number of cases, or in a particular category of crime, the courts may begin to suspect that the confessions are not assessments of legal merit, but serve instead as an indirect way to implement policy choices that are no longer the prosecutor's to make.
Attorney General's Brief at 19.

Indeed, as this case proves, a confession of error by a district attorney, no matter how well intentioned, may in fact be incorrect. It is for this reason judicial obligations compel all courts in this Commonwealth to examine independently the errors confessed before summarily granting relief.

For this reason, I find the District Attorney's contention this Court should "at a minimum [ ] remand the case to the PCRA court for further consideration in light of the parties' agreement that sentencing relief is appropriate[,]" District Attorney's Brief at 9, troubling. Under the facts of this case, where the District Attorney presents nothing new that was not already presented to the PCRA court, beyond the fact of its confession, there is simply no basis in law for the PCRA court to reach a different conclusion than the one the majority reaches here.

While I refer herein generally to PCRA courts in view of the circumstances of this case, there is in principle no reason why a common pleas court might not encounter a similar development outside of a post-conviction context. For example, the Commonwealth may concede before a trial court that a defendant's confession was obtained in violation of Miranda v. Arizona , 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969), or that the Commonwealth withheld evidence that forms the basis of a defendant's claim under Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

My point is that a persuasive confession of error by the Commonwealth may, in circumstances that are not presently before us, obviate the need for the PCRA court to delve into the undisputed merits of a particular claim. Similarly, the Attorney General's position is that a prosecutor's confession of error may be persuasive, or even highly persuasive, depending upon the circumstances of the case. Attorney General's Brief at 19. I agree. Justice Dougherty asserts that he agrees as well, yet in the same paragraph would foreclose any possibility whatsoever that the PCRA court ever could accept a prosecutor's confession or the parties' stipulation without "independently review[ing] the confessed error to ensure it meets the strict requirements of the PCRA." Concurring Opinion (Dougherty, J.) at 194. These expressions seem to conflict with one another. Permitting the court's "acceptance" of a confession of error only when the court first conducts an independent evaluation and concludes that the confession is well-founded is not "accepting" the confession of error at all. To the contrary, Justice Dougherty would require the PCRA court to conduct an independent judicial evaluation with or without the confession of error. Concurring Opinion (Dougherty, J.) at 194-95. For Justice Dougherty, a confession of error, standing alone, has no impact on the case whatsoever. If, and only if, the PCRA court first corroborates and endorses the Commonwealth's confession of error will the confession matter at all. Under this view, there is no deference.

Significantly, the decisions in Commonwealth v. Lesko , 609 Pa. 128, 15 A.3d 345 (2011), and Commonwealth v. Robinson , 623 Pa. 345, 82 A.3d 998 (2013), upon which the majority relies, concerned indicia of potential mental-health mitigation more subtle than a specific reference to potential organicity in the cognitive sense. See id. at 373, 82 A.3d at 1015 (discussing a decrease in childhood IQ scores); Lesko , 609 Pa. at 190-91, 15 A.3d at 382 (discussing the results of discrete psychological tests that did not specifically reference organicity).

From a concurring posture, I expressed a similar point of difference in Lesko . See Lesko , 609 Pa. at 249 n.1, 15 A.3d at 417 n.1 (Saylor, J., concurring).

The majority repeatedly equates the prospect of a timely investigation into organicity with a rejection of Dr. Tepper's advice. See, e.g. , Majority Opinion, at 157. Nothing in the majority opinion or on this record, however, affirmatively indicates that Dr. Tepper advised counsel at a meaningful time that no investigation into organicity was required. Instead, the portrait painted by at least one of the affidavits is one of severely dilatory preparation by counsel, placing Dr. Tepper in the position of making the best of a highly unfavorable situation created by counsel's delay. See, e.g. , Tepper Affidavit at ¶ 10 (attesting that counsel provided juvenile, school, mental health, and prison records to the psychologist -- including Dr. Moberg's report -- either upon the day that Appellant's trial commenced or one day before). Of course, to the degree that there is tension among the affidavits concerning such material matters, this gives rise to the need for an evidentiary hearing. See Majority Opinion, at 149-50 (citing Pa.R.Crim.P. 909(B)(2) ).
Responding to the Commonwealth's own concerns along the above lines, the majority notes that nothing in Dr. Tepper's affidavit "include[s] any contention that the timing of his receipt of Dr. Moberg's report had any substantive effect on his testimony." Majority Opinion, at 152 n.12. To me, this observation is relatively beside the point, since the critical concern is the impact of the assertedly late preparation on the defense investigation, for example, in terms of whether the defense should have consulted a neuropsychologist during the pretrial preparation phase. Cf. , Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background was itself reasonable ." (emphasis adjusted) ).
Finally, in discussing the principles applicable to the summary review stage of post-conviction litigation, the majority appears to recognize that judicial consideration of a motion to dismiss is not a fact-finding exercise. See Majority Opinion, at 149-50 (explaining that the summary-review process entails consideration of evidentiary proffers to determine whether the petitioner has raised a material issue of fact); accord Weaver v. Lancaster Newspapers, Inc. , 592 Pa. 458, 465, 926 A.2d 899, 902-03 (2007) (explaining that "the issue as to whether there are no genuine issues as to any material fact presents a question of law[.]"). Nevertheless, the majority proceeds to treat one discrete passage from one of the multiple, untested evidentiary proffers as "evidence of record" supporting a fact-finding judgment by the PCRA court. Id. at 153 n.13. From my point of view, this approach is precisely the sort of "analytical shortcut" with which I have expressed deep concern over the years. Keaton , 615 Pa. at 749-50, 45 A.3d at 1095 (Saylor, J., concurring and dissenting).

As emphasized in a 2018 Report of the Task Force and Advisory Committee to the Joint State Government Commission on Capital Punishment in Pennsylvania, "[d]uring the last 56 years, the Commonwealth executed three condemnees even though it has had a death penalty for approximately 50 of those years." Joint State Government Commission, Capital Punishment in Pennsylvania: The Report of the Task Force and Advisory Committee 1 (June 2018).

In terms of the absence of any provision in the Post Conviction Relief Act for approval by this Court of resentencing, I note that the Court has otherwise recognized that the internally inconsistent goals and mechanisms specified in the PCRA should give way to a fuller panapoly of remedies being made available under the enactment. See Commonwealth v. Lantzy , 558 Pa. 214, 222-25 & n.4, 736 A.2d 564, 569-70 & n.4 (1999).

I also note that Justices of the Supreme Court of the United States have discussed the substantial collateral consequences of the excessive delays in securing executions, including the decades-long maintenance of prisoners on death row in conditions that may produce "numerous deleterious harms." Glossip v. Gross , --- U.S. ----, 135 S.Ct. 2726, 2765, 192 L.Ed.2d 761 (2015) (Breyer, J., dissenting).

In defending its position, the majority does not reference a single decision of this Court that concerns a capital sentencing proceeding that post-dates Kelly . This is significant, given this Court's repeated holding that Kelly is not to be retroactively applied in post-conviction challenges to the stewardship of capital counsel. See, e.g. , Commonwealth v. Spotz , 610 Pa. 17, 116, 18 A.3d 244, 302 (2011). I recognize that there are a few decisions in which majorities of this Court have expressed a substantively narrow view of Kelly . See, e.g. , id. at 116, 18 A.3d at 302-03. Given, however, that such decisions emanated from trials in which Kelly was inapplicable in the first instance, I believe that those expressions are dicta , see, e.g. , id. at 200, 18 A.3d at 353 (Saylor, J., concurring), and the issue of Kelly 's substantive impact has thus remained a live one until the present time.